IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

WILLIAM MELVIN,                                    Civil Action No. 2:11-cv-00288

    Plaintiff,

v.

PYOD, LLC, and TOBIE GRIFFIN, ,

    Defendants.

## AFFIDAVIT OF TRICIA T. OLSON

Tricia T. Olson, being duly sworn on oath, states and alleges as follows:

1.    I am an attorney with the law firm of Adams and Reese, LLP, which represents the defendants in the above-captioned matter.

2.    Attached as Exhibit A are true and correct copies of the Bill of Sale and Assignment of Financial Assets, Declaration of Account Transfer, and Transfer and Assignments documenting the purchase by Sherman Originator LLC, and subsequent transfer to LVNV Funding, LLC, Sherman Acquisition, LLC, and, ultimately, Defendant PYOD, LLC ("PYOD"), of portfolio no. 8259.

3.    Attached as Exhibit B is a true and correct copy of the electronic data related to Plaintiff's account, received from the original creditor. This document has been designated as "Confidential," pursuant to the Protective Order in place in this matter.

4.    Attached as Exhibit C is a true and correct copy of a portion of an Account Event History, containing information related to the Plaintiff's CitiFinancial loan, and

indicating that the account was transferred to PYOD on August 21, 2007 with a charge off balance of $5,344.20. This document has been designated as "Confidential" pursuant to the Protective Order in place in this matter and has been redacted to protect sensitive information.

5.      Attached as Exhibit D are true and correct copies of selected pages from the transcript of the deposition of Tonya Henderson, taken on June 26, 2013. Ms. Henderson appeared as a Rule 30(b)(6) witness on behalf of PYOD, LLC. The pages have been redacted to protect confidential information.

6.      Attached as Exhibit E are true and correct copies of selected pages from the transcript of the deposition of Plaintiff William Melvin, taken on August 22, 2013.

7.      Attached as Exhibit F is a true and correct copy of the Retail Installment Contract and Security Agreement signed by Plaintiff on or about September 28, 2001. The Agreement was Exhibit 5 to Plaintiff's deposition, taken August 22, 2013.

8.      Attached as Exhibit G are true and correct copies of the Amendment Agreement, signed by Plaintiff on or about March 18, 2004, and the amendment summary. These documents were Exhibit 7 to Plaintiff's deposition, taken August 22, 2013.

9.      Attached as Exhibit H is a true and correct copy of "Plaintiff's Affidavit of Indebtedness and Ownership of Account," dated September 1, 2010, and signed by Tobie Griffin.

10.     Attached as Exhibit I are true and correct copies of selected pages from the transcript of the deposition of Defendant Tobie Griffin, taken on July 24, 2013. The pages have been redacted to protect confidential information.

2

11.    Attached hereto as Exhibit J is a true and correct copy of the Civil Warrant served on Plaintiff in the underlying state court action.  The Civil Warrant was Exhibit 2 to Plaintiff's deposition, taken August 22, 2013.

12.    Attached as Exhibit K are true and correct copies of selected pages from the transcript of the deposition of Joel Vallejo, taken on July 23, 2013.  Mr. Vallejo appeared as a Rule 30(b)(6) witness on behalf of Buffaloe & Associates, PLC.

13.    Attached as Exhibit L is a true and correct copy of the Sworn Denial filed by Plaintiff in the underlying state court lawsuit, on or about November 3, 2010.

14.    Attached hereto as Exhibit M is a true and correct copy of the Minutes of the Tennessee Collection Services Board for its regular meeting held on May 9, 2012.


FURTHER YOUR AFFIANT SAYETH NAUGHT.

Dated: _Nov. 19, 2013_

Tricia T. Olson

SWORN TO BEFORE ME this
19th day of November, 2013.

Notary Public

*(Notary seal: ANGEL EHIEMUA, STATE OF TENNESSEE NOTARY PUBLIC, DAVIDSON COUNTY, My Commission Expires May 5, 2015)*

## BILL OF SALE AND ASSIGNMENT OF FINANCIAL ASSETS

CitiFinancial Auto Credit, Inc., CitiFinancial Auto Corporation, and CitiFinancial Auto, Ltd. ("Assignor") hereby absolutely sells, transfers, assigns, sets-over and conveys to Buyer ("Assignee") without recourse, and without representations or warranties, express or implied, of any type, kind or nature,

(a) all right, title and interest in and to each of the Financial Assets identified in the Asset schedule attached hereto as Exhibit "A" (the "Financial Assets"), together with all promissory notes or other evidence of indebtedness in its possession; and

(b) all principal, interest or other proceeds of any kind with respect to the Financial Assets (including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of the Financial Assets into each or other liquidated property, including, without limitation, insurance proceeds and condemnation awards), but excluding any payments or other consideration received by or on behalf of Assignor prior to August 17, 20007 with respect to the Financial Assets; provided, however, that Seller shall retain all right, title and interest in and to any and all items of collateral which, prior to the Closing Date, may have been foreclosed upon or otherwise acquired by Seller through enforcement of any Collateral Document or proceedings in lieu of such enforcement.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Financial Assets Sale Agreement made and entered into by and between the Seller, and the Buyer effective as dated below, (the "Agreement"). The Financial Assets are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

**THIS BILL OF SALE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTS OF LAWS RULES THEREOF.**

DATED August 20, 20007.

> CitiFinancial Auto Credit, Inc.
> CitiFinancial Auto Corporation
> CitiFinancial Auto, Ltd.
>
> By: _Kenneth A. Schoech_
> Name: Kenneth A. Schoech
> Title: Vice President

STATE OF _Colorado_ )

COUNTY OF _Arapahoe_ )

This instrument was acknowledged before me on the _17_ day of _Aug_, 20007 by _Kenneth A. Schoech_ as _Vice President_ on behalf of CitiFinancial Auto Credit, Inc., CitiFinancial Auto Corporation, and CitiFinancial Auto, Ltd.

_____
Notary Public

My commission expires: _6·12·10_

(Notary seal: KAREN TOWNSEND, NOTARY PUBLIC, STATE OF COLORADO, My Commission Expires June 12, 20__)

**EXHIBIT A**

TNCONS0000639

## Declaration of Account Transfer

Sherman Originator LLC ("SOLLC"), without recourse, to the extent permitted by applicable law, transferred, sold, assigned, conveyed, granted and delivered to LVNV Funding LLC ("LVNV") all of its right, title and interest in and to the receivables and other assets (the "Assets") identified on Exhibit A, in the Receivable File dated August 20, 2007 delivered by CitiFinancial Auto Corporation, CitiFinancial Auto Credit, Inc., and CitiFinancial Auto, Ltd. on August 20, 2007 for purchase by SOLLC on August 20, 2007. The transfer of the Assets included electronically stored business records.

Sherman Originator LLC
a Delaware Limited Liability Company

By: _____
Name: Kevin Branigan
Title: Authorized Representative


LVNV Funding LLC
a Delaware Limited Liability Company

By: _____
Name: Les Gutierrez
Title: Authorized Representative

TNCONS0000640

Exhibit A

**Receivables File**

08.20.07

| Transfer Group | Portfolio | Transfer Batch |
|---|---|---|
| 66985 | 8259 | N/A |

**Transfer and Assignment**

LVNV Funding LLC ("LVNV"), without recourse, to the extent permitted by applicable law, transferred, sold, assigned, conveyed, granted and delivered to Sherman Acquisition, L.L.C. ("SALLC") all of its right, title and interest in and to the receivables and other assets (the "Assets") on April 02, 2009, identified on the Receivable File dated April 02, 2009. The transfer of the Assets included electronically stored business records.

LVNV Funding LLC
a Delaware Limited Liability Company

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name: Les Gutierrez
Title: Authorized Representative

SHERMAN ACQUISITION LLC

a Delaware limited liability company

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Name: Scott Silver
Title: Authorized Representative

TNCONS0000642

**Receivables File**
**04.02.09**

| Transfer Group | Portfolio | Transfer Batch |
|---|---|---|
| 131387 | | |

**Transfer and Assignment**

Sherman Acquisition, L.L.C. ("SALLC"), without recourse, to the extent permitted by applicable law, transferred, sold, assigned, conveyed, granted and delivered to PYOD LLC ("PYOD") all of its right, title and interest in and to the receivables and other assets (the "Assets") on April 02, 2009, identified on the Receivable File dated April 02, 2009. The transfer of the Assets included electronically stored business records.

SHERMAN ACQUISITION LLC

a Delaware limited liability company

By:

Name: Scott Silver

Title: Authorized Representative

PYOD LLC

a Delaware Limited Liability Company

By:

Name: Les Gutierrez

Title: Authorized Representative

Exhibit A

**Receivables File**

**04.02.09**

| Transfer Group | Portfolio | Transfer Batch |
| --- | --- | --- |
| 131388 | | |

## Account Event History

AccountID: 270867546
Account Number: ████████9701
Start Date: 7/18/2003
End Date: 7/18/2013

## Additional Account Data

| | | |
|---|---|---|
| Last Pmt Date: | Current Owner: PYOD LLC | Last Purchase Date: |
| Last Pmt Amt: | Current Interest Rate: 0.1200 | Last Purchase Amt : |
| Last NSF Amt: | Daily Interest: 1.75700 | Interest Effect: Do Not Accrue Interest |
| Last NSF Date: | Interest Effective Date: 07/18/2013 | Last Interest Update: 2/24/2011 |
| Total Pmt Txns: | Total NSF and Rev Txns: | Net Pmt Amt: |
| Chg Off Date: 3/27/2007 | Purchase Date: 8/21/2007 | Funding Date: 11/1/2012 |
| Chg Off Balance: $5,344.20 | Out of Statute Date: 3/27/2012 | ' |
| Orig Placement Balance: $5,344.20 | Date of first Delinq: 3/27/2006 | Misc Data 1: A |
| Putback Deadline: 2/16/2008 | | Misc Data 2: |
| Origination Date: 9/28/2001 | Product Source: Citifinancial, Inc. | Misc Data 3: |
| Sold To SFG By: Citifinancial, Inc. | Original Merchant: | Misc Data 4: |
| CCA Number: | CCA Proposed Pmt: | CCA Accepted Pmt: |
| CCA Start Balance: | CCA Phone: | |

Resurgent Capital Services - CONFIDENTIAL AND PROPRIETARY

Page 12 of 12 - 7/18/2013 12:53:02 PM

CONFIDENTIAL

TNCONS0000673



EXHIBIT

C

tabbies®

Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 11 of 69   PageID #: 871

United States District Court
Eastern District of Tennessee
Greeneville Division

| | | | |
|---|---|---|---|
| Lorinda Smith | ) | No: | 2:11-CV-379 |
| Joan Lepage | ) | No: | 2:12-CV-1 |
| Greg Swanson | ) | No: | 2:12-CV-2 |
| Alfred Hickman | ) | No: | 2:12-CV-45 |
| Samuel Voorhees | ) | No: | 2:12-CV-77 |
| Alice Smith | ) | No: | 3:11-CV-510 |
| Robert Bradford | ) | No: | 2:11-CV-291 |
| Mary Smith | ) | No: | 2:11-CV-356 |
| Carl Sells | ) | No: | 2:11-CV-355 |
| Angela Fitch | ) | No: | 2:12-CV-56 |
| Mildred Daniels | ) | No: | 2:12-CV-155 |
| Peggy Roberson | ) | No: | 2:12-CV-168 |
| Katheryn Conner | ) | No: | 2:12-CV-184 |

vs.

LVNV Funding, LLC.,
et al,

and

William H. Melvin          No:  2:11-CV-288

vs.

PYOD, LLC., Et Al

Deposition of: Tonya Henderson
Travelers Rest, South Carolina

Date Taken:  June 26, 2013
Time Began:  10:00 A.M.
Time Ended:  11:32 A.M.

Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376

www.depo.com

Reported By:  Cindy Powell Gilliam

Job No.:  A4706B58



ATKINSON-BAKER, INC.                    1-800-288-3376

```
 1   Q.   All right.  Just making sure we have the same

 2        understanding.  Now, what are they demanding?

 3   A.   Who is "they"?

 4   Q.   Nathan & Nathan on behalf of LVNV?

 5   A.   Okay.  It appears that they're demanding the

 6        principal sum of Two thousand six hundred and

 7        twenty dollars and eighty-four cents ($2,620.84),

 8        plus attorney's fee of maybe zero (0), plus

 9        interest of Nine hundred and sixteen dollars and

10        six cents ($916.06).  It's very hard to read total

11        judgment except maybe at the bottom.  It might

12        come to Three thousand five hundred thirty-six

13        dollars and ninety cents ($3,536.90).

14   Q.   Well, and it also says "continuing interest and

15        court costs"?

16   A.   Yes, it does.

17   Q.   And can you tell what interest rate they're using

18        to calculate interest and continuing interest?

19   A.   No, sir, not from this document.

20   Q.   Would they have gotten anything from LVNV as to

21        the interest rate?

22             By Mr. Kostolnik:  Object to the form.

23   A.   No, sir.

24   Q.   Do you know how Nathan & Nathan calculated the

25        interest rate?
```

27

```
 1  A.  I don't know how Nathan & Nathan calculated it

 2      specifically.

 3  Q.  So you don't know how Nathan & Nathan came up with

 4      the Nine hundred and sixteen dollars ($916)

 5      demand, and to be accurate plus six cents (.06)?

 6  A.  No, sir, I don't know what they calculated it on

 7      being Nathan & Nathan.

 8  Q.  Would anybody at LVNV know or had been involved in

 9      the preparation of this amount?

10  A.  No, sir.

11  Q.  So if I'm understanding correctly, this affidavit

12      -- what happens?  Is it sent to Nathan & Nathan?

13      Exhibit Two (2).

14          By Mr. Kostolnik:  Two (2)?

15  Q.  Yes.

16  A.  Yes, sir.  Any affidavit prepared for that account

17      would be given to the attorneys.

18  Q.  And what is the effect of this going to Nathan &

19      Nathan?

20          By Mr. Kostolnik:  Object to the form.

21  Q.  What does LVNV expect to happen after this is sent

22      to Nathan & Nathan?

23  A.  I'm not really sure I understand the question.

24  Q.  Do you, do you expect this to initiate a lawsuit

25      in Tennessee?
```

                                                                    28

```
 1        a minute.  I think we may be done.
 2   Direct Examination by Mr. Mechem resumes:
 3   Q.   One last question, is LV licensed, LVNV licensed
 4        to collect debts in any state that you know of?
 5   A.   It's my understanding that LVNV is licensed if it
 6        is required by a particular state of passive debt
 7        buyers.
 8   Q.   Okay.  Do you know what states those are?
 9   A.   I do not.
10
11
12
13
14        By Mr. Mechem:  Okay.  That's all we have.
15   A.   Thank you.
16   Cross Examination by Mr. Kostolnik:
17   Q.   Just one (1) question.  I believe you testified
18        that LVNV signs collection management servicing of
19        accounts through Resurgent; is that right?
20   A.   Yes.
21   Q.   And Resurgent is the entity to your understanding
22        that actually contracts with law firms like the
23        law firms that are mentioned herein the lawsuits
24        we're talking about, mainly Cosco, Buffaloe &
25        Associates, Nathan & Nathan, et cetera?
```

| | |
|---|---|
| 1 | A. Yes, Resurgent does. |
| 2 | Q. As it relates to collection decisions made by the |
| 3 | law firm, would the law firm and Resurgent have |
| 4 | knowledge as to how those decisions are made? |
| 5 | A. Yes. |
| 6 | Q. Does LVNV weigh in on those decisions? |
| 7 | A. No. |
| 8 | Q. Does LVNV attempt to influence those decisions? |
| 9 | A. No. |
| 10 | Q. Does LVNV dictate or direct those decisions? |
| 11 | A. No, sir. |
| 12 | By Mr. Kostolnik: All right. I have no more |
| 13 | questions. I would, however, attach for the |
| 14 | record a copy of the objections to the Deposition |
| 15 | Notice that I served. |
| 16 | (Exhibit "10" marked and entered) |
| 17 | By Mr. Mechem: Can you tell me it's the same |
| 18 | thing you sent me? |
| 19 | By Mr. Kostolnik: It better be. And the |
| 20 | objections are noted as Exhibit Ten (10) and the |
| 21 | last of it states for the record that in |
| 22 | discussions with counsel off the record, Mr. Alan |
| 23 | Lee and I have agreed that we will proceed with |
| 24 | stipulation to enter a Protective Order on the two |
| 25 | (2) cases, Lorinda Smith and Alice Smith, of the |

51

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TENNESSEE
2                      AT GREENEVILLE
3  ===================================================

4  WILLIAM H. MELVIN,

5          Plaintiff,

6  vs.                        Case No. 2:12-cv-00288

7  PYOD, LLC, and             District Judge Greer
   TOBIE GRIFFIN,             Magistrate Judge Inman
8
           Defendants.        Jury Trial Demanded
9
   ===================================================
10 ===================================================

11

12

13

14
                Deposition of:
15
                WILLIAM HOWARD MELVIN, JR.
16
                Taken on behalf of the Defendants
17              August 22, 2013

18

19

20

21
   ===================================================
22 ===================================================
              Elite  Reporting  Services
23          www.elitereportingservices.com
              STEPHANIE LAKE JONES, LCR
24                P.O. Box 292382
              Nashville, Tennessee 37229
25                (615)595-0073
```

Case 2:11-cv-00288-JRG-DHI   Document 31-5   Filed 11/19/13   Page 17 of 69   PageID #: 877

EXHIBIT E

```
 1              THE WITNESS:  Just ask the question
 2   again.
 3              MS. DOERR:  Okay.  Can you repeat the
 4   question, please?
 5              (WHEREUPON, the court reporter reads
 6   back the pending question.)
 7              THE WITNESS:  Okay.  The last payment,
 8   is this for the vehicle, the Citi Bank?
 9              (Off-the-record discussion.)
10   BY MS. DOERR:
11   Q.    Mr. Melvin, I had asked you why it is that
12   you are suing my clients, PYOD, LLC, and Tobie
13   Griffin?
14   A.    Never remember talking to Tobie Griffin.
15   Q.    Okay.
16   A.    Never even heard his name.
17   Q.    Okay.
18   A.    The first loan was with Transouth.
19   Q.    Okay.
20   A.    Paid them for -- I'm thinking a year and a
21   half maybe.  And then the next thing I knew, I was
22   getting bills from Citi Bank.
23   Q.    Okay.
24   A.    Thought the loan was paid off, kept getting
25   calls from them.  And then finally I told them it
```

```
 1   was paid off, asked for my title.  Never received a
 2   title.  From that point on, never heard anything
 3   for months.  And then received a letter from the
 4   office -- the law office here on it, and then from
 5   that point on never heard from them again until, I
 6   guess, a year ago.  I got another letter from them.
 7   And this was well after --
 8   Q.     When you say from "them" --
 9   A.     From Citi Bank.
10   Q.     -- who do you mean?  Okay.
11   A.     Or whoever the collector was.
12   Q.     I see.  You say you got a letter from the
13   law firm here?
14   A.     Correct.
15   Q.     What was that letter about?
16   A.     It was just to come in and go over the
17   situation, the loan situation, to pay off or --
18   Q.     Was that after my clients had sued -- or
19   that PYOD, LLC, had sued you in state court?
20   A.     I never got sued by them until after I came
21   in here.
22   Q.     Okay.
23   A.     I would get letters wanting money and saying
24   that -- how much I owed and stuff like that.
25   Q.     Okay.
```

```
1   Number 5.
2   A.      Okay.  This is from First Transouth,
3   correct?
4   Q.      I'm asking you.
5   A.      Well, I'm sure it's the one because it's
6   from Transouth and it has where I traded the '88
7   Beretta in on it.  So I had to have seen it if I
8   signed it.
9   Q.      That is your signature on the bottom of the
10  first page?
11  A.      Yes, ma'am.
12  Q.      And you said this is from Transouth, and if
13  I'm reading that right it says, Retail Installment
14  Contract and Secure."  And my guess is under the
15  copy of a barcode sticker there, it says, Security
16  Agreement.  Again, I can't say that with
17  100 percent certainty because it's covered up.
18              MR. MECHEM:  We would tend to agree
19  with you.
20  BY MS. DOERR:
21  Q.      Okay.  But it's my understanding -- and it
22  sounds like it's your understanding -- that this is
23  the agreement that you entered into when you
24  purchased the -- or when you financed the 1998
25  Mitsubishi Gallant, correct?
```

```
 1   A.      Correct.

 2   Q.      Do you remember what your monthly payment

 3   was on that car?

 4   A.      I'm thinking right around 250.  I mean, I'm

 5   not sure, but I think it was 250.

 6   Q.      And the date of this contract was

 7   September 28th, 2001, correct?

 8   A.      Correct.

 9   Q.      Did you ever refinance your loan?

10   A.      I had it rolled over, just a payment

11   rollover.  I'm not sure if that's a refinance or --

12   Q.      When you said you had the "payment rolled

13   over," what does that mean?

14   A.      From what I understand it means, it means

15   that you -- they just delay a payment, and they

16   just refinance -- well, I guess it was a refinance.

17   The payment on interest and the interest adds up on

18   it.  You don't get any interest -- it goes back to

19   the same interest or whatever.

20   Q.      I under --

21   A.      I don't know.  I don't understand.

22   Q.      Okay.  Why did you roll it over?

23   A.      Probably because I didn't have any money to

24   pay the payment with at the time.

25   Q.      Did you miss a payment?
```

```
1   A.      I'm sure, or was being late or getting ready
2   to be late or whatever.
3   Q.      Did you miss more than one payment?
4   A.      I'm sure I did.
5   Q.      Do you remember specifically?
6   A.      It's been 12 years ago.  I don't remember.
7   Q.      Do you remember how long it was after you
8   first had the car financed that you rolled it over?
9   A.      I'm thinking the first time was maybe eight
10  or nine, maybe ten months.  I'm not sure of that
11  either.
12  Q.      When you determined that you weren't going
13  to be able to make a payment, what did you do?
14  A.      Contacted them.
15  Q.      By phone?
16  A.      By phone or would walk in, one of the two.
17  Q.      When you say "walk in," walk in where?
18  A.      In their office.
19  Q.      Whose office?
20  A.      Transouth.
21  Q.      Okay.
22          MS. DOERR:  Will you mark this as
23  Deposition Exhibit Number 6, please?
24          (WHEREUPON, the above-mentioned
25  document was marked as Exhibit Number 6.)
```

```
1   A.       Yeah, I guess it is.

2   Q.       Okay.

3            MS. DOERR:  Would you mark this as

4   Exhibit 7.

5            (WHEREUPON, the above-mentioned

6   document was marked as Exhibit Number 7.)

7            THE WITNESS:  Now this right here --

8   well, this up here has a Mitsubishi.  This has --

9   what I'm referring to is the Beretta.  I never seen

10  a title or a certificate from the Mitsubishi at

11  all, never.  Even after I thought it was paid off,

12  I still never received a title from them.

13  BY MS. DOERR:

14  Q.       When you say "from them," who do you mean?

15  A.       From whoever took -- this was sold.

16  Transouth was sold to Citi Bank, from what I

17  understand.

18  Q.       Okay.

19  A.       And then other ones after that, other loan

20  or collection loan places.  That's just...

21  Q.       So it's your understanding -- and please

22  correct me if I'm wrong -- that somebody else came

23  to hold the lien?

24  A.       The title, right.  I never seen this title

25  at all, and that was after I had -- by my paperwork
```

```
1    back seven or eight years ago, that I thought the
2    title -- the car was paid off and never received a
3    title.
4    Q.      Okay.
5    A.      And then after I contacted them, that's when
6    they started calling me.  I'm talking Citi Bank or
7    whoever might have ended up -- I think what we
8    found out here is that it had been sold four times.
9    Q.      Okay.
10   A.      At the -- at the DMV, it still had Transouth
11   on it.  When I came in here the first time to talk
12   to these guys, went straight to the DMV.  It still
13   said Transouth.
14   Q.      When you -- strike that.
15           At some point you believe you had paid off
16   the Mitsubishi in full, correct?
17   A.      Correct.
18   Q.      Who did you send that last payment to?
19   A.      Citi.
20   Q.      Okay.  And did Citi Bank send you --
21   A.      Nothing.
22   Q.      -- a letter?
23   A.      Nothing.
24   Q.      Did you note when you sent that last payment
25   that it was payment in full?
```

```
1   A.      To my knowledge it was.

2   Q.      Did you pay by check?

3   A.      By money order.

4   Q.      By money order.  Does the money order allow

5   you to put in any --

6   A.      Well, I'm --

7   Q.      -- text?

8   A.      To my -- well, I'm sure you can write on it

9   whatever you want to.  And when they cash it, I'm

10  sure -- to me, that's a binding contract if they

11  cash the -- or take the payment.  That's, you

12  know -- of course, that's without any guidance from

13  anybody or anything like that.  That was just what

14  I thought, you know.  Write this on here.  They

15  cash it or if they don't send me nothing back, then

16  the car is paid off.

17  Q.      Okay.  Did you receive a statement from Citi

18  Bank every month?

19  A.      Sometimes I would get one.  Sometimes it

20  would be phone calls, like four and five a day.

21  One year I received over 500 phone calls from them,

22  the last one being on a Sunday night, and that's

23  when I told them that I had paid it off on the

24  Friday before and I wasn't talking to anyone else

25  about it.  And I never did hear anything else from
```

Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 25 of 69   PageID #: 885

```
1   that point on.  I couldn't tell you the date or the
2   year.
3   Q.     Okay.
4   A.     But I never heard nothing else from them
5   for, I'm thinking, almost a year.  And they sent me
6   a thing in the mail, This is what you owe.  This is
7   what we'll take as a payoff.
8   Q.     And when you say "they," you're talking
9   about Citi Bank?
10  A.     Citi Bank.
11  Q.     Okay.  And the person that you told that you
12  had paid the loan off, that was a Citi Bank person?
13  A.     That was a call center.
14  Q.     For Citi Bank?
15  A.     I'm not sure who it was from.  I think most
16  of those go over to those call centers.  I'm not
17  sure.
18  Q.     Okay.  At the time that you made the final
19  payment, the payment that you believe to be paying
20  it off in full, to your knowledge was that payment
21  made on time?
22  A.     I'm not sure.  I'm not sure.  I can't
23  remember if it was or not.  I'm sure it was within
24  a week or a month within those 30 days of.
25  Q.     Okay.
```

```
 1   A.      Like I said, never did hear anything else
 2   from them.
 3   Q.      And that was seven or eight years ago, you
 4   said?
 5   A.      Correct.
 6   Q.      So that would be '05, '06, in that range?
 7   A.      '05, '06 I think is the range that we
 8   figured out.
 9   Q.      Okay.  And you said that prior to that call
10   where you told somebody from the call center that
11   you had paid off this loan, you had received over
12   500 calls?
13   A.      In one year, I marked down on the calendar
14   over 500 calls in that year preceding the payoff.
15   Q.      Were all the calls related to --
16   A.      All the calls were related --
17   Q.      -- this Citi Bank --
18   A.      Well, I don't remember if it was Citi Bank
19   or just a call center.  One person might call you,
20   and then an hour later, another representative
21   might call you.
22   Q.      Were all of the 500 calls related to this
23   debt?
24   A.      Sure.  They was all the same numbers.
25   Q.      Do you have any credit cards?
```

```
1    Q.     Is that your mother's telephone number as

2    well?

3    A.     Correct, has been for 50 years.

4    Q.     Did she ever talk to anyone from Citi Bank?

5    A.     She don't discuss anything with anybody

6    that's about me.

7    Q.     Do you know if she ever picked up the phone?

8    A.     I'm sure she answered the phone.

9    Q.     Okay.

10   A.     I mean, she's 93 years old, so that means

11   she was what, 85 then?  Probably couldn't remember

12   who called and who didn't, still can't.  Of course,

13   in those years it's gotten worse, but it was always

14   just an understanding that if somebody calls on

15   stuff like that, just tell them I'm not here and

16   it's as simple as that.  Just like I don't answer

17   her phone calls and get into her personal...

18   Q.     Okay.  Mr. Melvin, I think the court

19   reporter has handed you a document that's been

20   marked as Deposition Exhibit Number 7.  Do you

21   recognize this document?

22   A.     No, I don't remember it.

23   Q.     Is that your signature on the second page of

24   this document?

25   A.     It appears to be, but I got so many
```

1  documents that I couldn't tell you one from the
2  other.
3  Q.    Okay.  I don't mean any disrespect, but you
4  had said earlier that you don't read so well.  Is
5  it all right if I read the first paragraph of this
6  document to you and then ask some questions?
7  A.    Yeah.
8  Q.    Okay.  This is the first couple of
9  paragraphs of what's been marked as Deposition
10 Exhibit Number 7.  It says, "This amendment
11 agreement is made and takes effect as of the 18th
12 day of March 2004, by and between Transouth
13 Financial Corporation and William H. Melvin
14 relating to a motor vehicle retail installment sale
15 contract or promissory note and security agreement,
16 dated September 28th, 2001, and having" -- and then
17 it lists your account number or an account number.
18        Then it says that "Company," which was
19 defined as Transouth, "and Borrower," which was
20 defined as you, "acknowledged that the total amount
21 due and owing under the contract as of the above
22 date is $9,315.94."
23        Mr. Melvin, do you think March 2004 is when
24 you rolled over -- the rollover you talked about
25 earlier?

```
 1   A.      I'm not sure if that's the rollover or if
 2   when Citi Bank might have bought the account.
 3   Q.      Okay.
 4   A.      There again, I don't remember.  I mean, I
 5   could have went in and signed something.  I'm not
 6   sure if I did or not.
 7   Q.      Okay.  Skipping down a few lines, this
 8   document says, "Borrower" -- again, that's you --
 9   "hereby promised to pay to the order of Company,"
10   that's Transouth, "the total amount due together
11   with interest on the unpaid principal balance as
12   exists from time to time at the rate of 12 percent
13   per annum after the date hereof until maturity as
14   follows:  In 45 monthly installments of $259.20
15   beginning May 1st, 2004, and continuing until
16   January 1, 2008, when the final payment will be
17   due."
18          And then I had asked you whether you thought
19   that was your signature on the next page.
20   A.      I guess I went ahead and signed it then.
21   Q.      Okay.  Does that arrangement that I just
22   read sound familiar to you?
23   A.      Yeah.  It does sound familiar to me, but
24   that was through Transouth.
25   Q.      I understand that that was through
```

```
 1  Transsouth.  Do you remember your monthly payment
 2  being about $259.20?
 3  A.      Well, I was thinking 250 or in that range,
 4  yes.
 5  Q.      Okay.  And you stated earlier that you
 6  sometimes missed a monthly payment; is that right?
 7  A.      Right.
 8  Q.      And I'll admit that I didn't do the math,
 9  but this says 45 monthly payments starting in May
10  of 2004 and continuing until January of 2008.  Did
11  you sometimes pay more than was due on the account?
12  A.      I think a couple times I may have paid two
13  payments to try to get caught back up or something
14  on the loan.
15  Q.      Did you ever pay it ahead?
16  A.      Not that I remember.
17  Q.      Okay.  My question is if the 45 months ran
18  until January of 2008, how could it be that you
19  would have paid off the loan in 2006 or '7?
20  A.      I don't know.  I don't remember how that
21  worked.
22  Q.      Okay.  When you made what you believed to be
23  the last payment due, you said you made that
24  payment on a Friday, right?
25  A.      On a Friday.
```

Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 31 of 69   PageID #: 891

```
 1              MS. DOERR:  Yes.

 2              MR. MECHEM:  Yeah, it starts right

 3   there.

 4   BY MS. DOERR:

 5   Q.      And under that, it says "promise to pay,"

 6   and I'll just read what it says there.  "You agree

 7   to pay us the amount shown as total of payments in

 8   accordance with the payment schedule shown above.

 9   This amount is payable in consecutive monthly

10   payments commencing on the first due date, shown

11   above, and on the same day of each succeeding month

12   until fully paid."  And you signed this document,

13   correct?

14   A.      Correct.

15   Q.      Okay.  Back up at the top of the page

16   underneath the block where it has your name, above

17   the block where it lists the used 1998 Mitsubishi

18   Gallant, the very last sentence says -- and I've

19   highlighted it -- "We, us, and our mean the seller

20   or anybody to whom this contract is transferred or

21   assigned."  The seller is Transouth, and you

22   yourself stated that they later sold the loan to

23   Citi Bank, correct?

24   A.      I guess.  I started getting payments or

25   calls from Citi Bank on it.  Never did hear from
```

```
 1   Transouth.  The building shut down and everything.
 2   Q.     But you understood that you still had to pay
 3   Citi Bank on the loan?
 4   A.     Never did hear anything from Citi Bank for
 5   months after that.  Kept trying to pay, and then
 6   they gave me a PO number to start sending payments
 7   to.
 8   Q.     And did you start sending payments?
 9   A.     I'm sure I did.
10   Q.     Okay.
11   A.     At the first of this loan, it took them
12   three months to ever get me set up with Wallace in
13   a loan situation.
14   Q.     When --
15   A.     You will see that the car was sold to me
16   like in September.  The first payments were way
17   down into October, November, right, where I didn't
18   have nowhere to make payments.  Couldn't get
19   insurance or anything.  From our first date of
20   getting the Mitsubishi, there was nowhere to make
21   no -- no loan signed.  The lady at Wallace
22   Mitsubishi finally said, This is our last chance,
23   and she called Transouth and got me set up, which
24   was a good two-and-a-half to three months after the
25   car was in my possession.
```

```
1   A.      I sure do.

2   Q.      Did you keep the statements from Transouth?

3   A.      I did up until the point of '07, '06, '08,

4   in those years when --

5   Q.      Okay.

6   A.      When all of it I thought was done, then I

7   kept them for probably a few months, and then I

8   cleaned all of it out and don't have any of it to

9   bring any of it.

10  Q.      Before you paid off -- strike that.

11          When you thought you were making the final

12  payment on the Mitsubishi Gallant, did you contact

13  Citi Bank to get a payoff amount or a payoff

14  number?

15  A.      No.  No.  It was just on paperwork that I

16  had just wrote down and kept, you know -- just

17  laying.

18  Q.      Did you keep records of what you paid?

19  A.      Just monthly payments, and that was the

20  receipts off of the money orders.

21  Q.      And do you still have those?

22  A.      No.

23  Q.      Do you have any way of proving that you made

24  those payments?

25  A.      I'm sure just through FedEx money orders or
```

```
 1   whatever it's called.
 2   Q.      Do you remember who you bought the money
 3   orders from?
 4   A.      Wal-Mart sometimes, sometimes from Food
 5   City.
 6   Q.      Okay.  It was --
 7   A.      Most of the times it was the ones that had
 8   to be within 12 hours, would be from Wal-Mart.
 9   Because they'd send them straight in, and you call
10   it in when you got to your house with the PO number
11   or whatever, and then the payment would be made.
12   The ones from Food City or 7-Elevens or whatever,
13   you just mailed them in.
14   Q.      Do you have a bank account?
15   A.      No.  Don't never had a checking account.
16   Q.      Have you ever had a savings account?
17   A.      No.
18   Q.      Did you and your wife have a joint account
19   when you were married?
20   A.      Yes.
21   Q.      Was that a checking account?
22   A.      Yes.
23   Q.      What bank was that with?
24   A.      I can't remember.
25   Q.      Have you had --
```

```
1    Q.       Okay.  Your monthly payment was, give or
2    take, $260, correct?
3    A.       Correct.
4    Q.       My question at this point is, do you have
5    any explanation as to how the math is off by so
6    much?  You thought it was paid in full, yet my
7    client thought you still owed --
8    A.       I have no explanation for how I --
9    Q.       -- $5,300?
10   A.       -- how I come to these conclusions.
11   Q.       Okay.
12   A.       I guess just trying to remember it and just
13   writing down bits and pieces.
14   Q.       Okay.  Where did you write down bits and
15   pieces?
16   A.       Just at home, like maybe a notebook or a
17   piece of paper or something like that.
18   Q.       Do you still have that notebook?
19   A.       No.  The first time I ever seen any of this
20   stuff right here was right here.  I was never
21   summonsed at my house by a processor or a sheriff's
22   department to show up in court for any of this.
23   Q.       You're saying you were never served with the
24   complaint, correct?
25   A.       No, that I remember.
```

```
 1    Q.      Oh, okay.  Well, have you ever been served
 2    with a process before?
 3    A.      On my child support that I can sit here and
 4    honestly remember.
 5    Q.      Okay.
 6    A.      Well, there was one -- there was one on a
 7    rental ladder that I didn't take back that they
 8    said I owed more, but, I mean, that was -- that was
 9    like through East Tennessee Rental or something
10    like that.  And then when the ladder got back, I
11    never heard anything else.
12    Q.      Okay.  So you were not served on
13    November 9th of 2010 with the civil summons?
14    A.      If I was, it was through this court, this
15    office right here.
16    Q.      Okay.
17    A.      That as far as -- I can't remember a sheriff
18    or a processor or anyone coming to my house and
19    giving -- and making me sign for this stuff.
20    Q.      Okay.  Did you receive a letter from
21    Buffaloe & Associates dated March 29th, 2010?
22    A.      It seems possible that I did see something
23    like that.
24    Q.      Do you still have a copy of that letter?
25    A.      No.
```

```
 1    Q.      Did you receive a settlement offer from
 2    Buffaloe & Associates dated March 15th -- or, I'm
 3    sorry, March 16th, 2010?
 4    A.      I'm not sure of the date, but I received one
 5    that said a payoff of 500 or something like that.
 6    But still, at that point, I thought I was paid.
 7    Q.      On either of those letters, was there a
 8    number to call if you disputed --
 9    A.      I don't know.  Probably --
10    Q.      -- the account?
11    A.      I probably just threw it in the trash.
12    Q.      Okay.  Even though you thought it was paid
13    off?
14    A.      I'm sure.  I mean, you know, I see no reason
15    to keep it.
16    Q.      Well --
17    A.      I can't -- I can't sit here and say that I
18    have received anything except for the letter that I
19    brought down here to them since that happened.
20    Q.      Since what happened?
21    A.      Since they -- since I came down here and
22    consulted with Mechem Law Firm the first time.
23    Q.      Okay.  What about before that?
24    A.      (No response.)
25    Q.      I think, if I understand your testimony
```

```
 1   marked as Exhibit Number 3 before?

 2   A.      If I did, it was in the office.

 3   Q.      Okay.  Exhibit Number 3 was attached to --

 4   or the document, the copy of the document that has

 5   been marked as Exhibit Number 3 was attached to the

 6   civil warrant that my client believed, in any case,

 7   that they served upon you.  And that document,

 8   Exhibit Number 3, is an affidavit that has been

 9   signed under penalty of perjury by Tobie Griffin.

10   Do you see that?

11   A.      I see his -- I see where he has autographed

12   something above his name.

13   Q.      It's a woman.  Tobie Griffin is a woman.

14   A.      Well, its name then.

15   Q.      Will you take a moment and read paragraphs 3

16   and 5 of the affidavit to yourself?

17   A.      (Reviews documents.)  It's gibberish to me.

18   Q.      Okay.

19   A.      Like I said before, anything I've seen on

20   this has been through this office or that was shown

21   to me and explained.  And like I said, I have a

22   very bad memory, so from that point on I couldn't

23   tell you.

24   Q.      Okay.  I'm going to read paragraph 3 into

25   the record.  It says, "Based on the business
```

```
 1          Do you agree with that summary?
 2    A.     No.  I think I paid it off.
 3    Q.     Okay.  Can you take a look at the document
 4    that's been marked as Deposition Exhibit Number 1?
 5    Turn to page 15 of that document, paragraph 61.
 6    A.     First page counting as the first page?
 7    Q.     I think it says the page numbers on the
 8    bottom.
 9               MR. MECHEM:  See, if you --
10               THE WITNESS:  Oh, I see now.  15?
11    BY MS. DOERR:
12    Q.     Yeah, paragraph 61.  That paragraph says,
13    "Defendant PYOD, LLC, filed a state court
14    collection lawsuit against plaintiff in an attempt
15    to collect the debt using a false, deceptive, and
16    misleading affidavit as the only evidentiary basis
17    to support its claims," and then it goes on.
18          Can you tell me what about the affidavit you
19    believe to be false?
20    A.     The only thing I think is that I think I
21    paid the loan off under my personal beliefs.
22    Q.     Do you have anything to support those
23    beliefs?
24    A.     No.
25               MR. MECHEM:  Object.  Asked and
```

```
 1   answered to the extent that he said he has paid it.
 2   Now, with regard to records, he says he doesn't
 3   have them but he said he paid them off.
 4   BY MS. DOERR:
 5   Q.      Mr. Melvin, what about the affidavit do you
 6   believe to be deceptive?
 7   A.      I think I paid it off.  That's what I'm
 8   getting from you is you're trying to get me to say
 9   that I owe that and I don't.  I think because I
10   paid it off at some point and talked to the lady
11   and told her.  And then on the last money order
12   that was sent to them, I marked, Paid in full.
13           Now, whether it shows or not or where it's
14   at, I have no idea -- or what the dates is, I have
15   no idea and I don't remember.  And I just know
16   between those two years you pointed out to me that
17   some of those dates are off but, of course, like I
18   said, I'm not well educated.  Don't have a real
19   good memory of anything.  Just on that right there,
20   I think that I have taken care of the loan.
21   Q.      You stated just now that you told the woman
22   that it was paid off.  Are you referring to the
23   woman that you spoke with on a Sunday evening?
24   A.      Correct.
25   Q.      After you paid -- you believe that you paid
```

```
 1  off the account the previous Friday?

 2  A.      Correct.

 3              THE WITNESS:  Can I walk away from this

 4  for a minute?

 5              MR. MECHEM:  Sure.

 6              (Short break.)

 7  BY MS. DOERR:

 8  Q.      Mr. Melvin, I think you were saying before

 9  we took a break that it was your personal belief

10  that you had paid off this loan?

11  A.      Correct.

12  Q.      And we've established that you don't have

13  any records to prove that?

14  A.      Correct.

15  Q.      And you never provided any records to Citi

16  Bank to show that?

17  A.      Correct.

18  Q.      And Citi Bank says that you owe over $5,000.

19  A.      Correct.

20  Q.      Do you think they should just take your word

21  for it that you paid?

22  A.      I plead the Fifth on that.  I don't know

23  what they should consider.

24  Q.      Is there any reason that Tobie Griffin

25  shouldn't have relied on Citi Bank's statement when
```

```
1    she made her sworn affidavit?

2    A.      Never talked to Tobie Griffin.

3    Q.      I'm asking you if she should not have

4    believed --

5    A.      I'm telling you that I have never had any

6    contact except for these papers that you're showing

7    me with Tobie Griffin.  I don't know what she --

8    what her -- whatever.  I have no idea what she's

9    thinking or what she thinks I'm thinking.

10   Q.      Tobie Griffin swore under penalty of perjury

11   that upon review of Citi Bank's records, she

12   believes the amount owing is -- the principal

13   amount owing is $5,344.20.

14   A.      That's her prerogative.  If she's got that

15   paperwork and I don't have anything, then I don't

16   know what to say except I think that I paid it.

17   Q.      Can you tell me what you believe to be

18   misleading about the affidavit?

19   A.      I didn't say anything was misleading except

20   that they say I owe this, and I say I don't.

21   Q.      Okay.  So you allege in paragraph 61 of your

22   complaint that the affidavit is misleading.

23   A.      I'm sitting here trying to think whether

24   you're putting words in my mouth or what.  I'm

25   telling you that I have never seen any of this
```

```
1   stuff until we started in with this with
2   Mr. Mechem's law firm, and I think that I have paid
3   it off.
4   Q.      Okay.
5   A.      Now, that's what I'm -- that's my conclusion
6   of the whole...
7   Q.      Mr. Melvin, can you turn to page 22 of
8   Exhibit Number 1?
9   A.      (Complies.)
10  Q.      In paragraph 98, you allege that as a result
11  of defendant's violations of the FDCPA -- and the
12  FDCPA is the law that you sued my clients under --
13  plaintiff is entitled to actual damages.  What are
14  your actual damage, Mr. Melvin?
15  A.      My -- what I think was my damages was
16  harassment from the phone.
17  Q.      Can you tell me more about that?
18  A.      The phone calls, simple as that.  Calling me
19  back and then call me a liar or whatever, that I
20  didn't make the payment on the Friday night before,
21  and then to that point it stopped.  And until I
22  came to his office to meet with him, I had no idea
23  that anything else was going on as far as letters
24  in the mail, any collection agents.  I don't read
25  them because I get stuff -- because I used to get
```

Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 44 of 69   PageID #: 904

```
 1   stuff all the time, but I haven't in the last two
 2   or three years now.
 3   Q.      Are you -- is it your testimony that you
 4   didn't read the collection letters you received?
 5   A.      I guess it is.
 6   Q.      You said that --
 7   A.      I mean, I wouldn't have no idea who they was
 8   if I didn't read them.  I mean, if you get one, you
 9   throw it away.  I mean, that's just my personal --
10   the way I do it.  I mean, because I don't know of
11   them.  I mean, child support is about all I owed,
12   and then I thought this was taken care of.  So I,
13   you know --
14   Q.      So you said somebody called you a liar?
15   A.      The lady said that I did not talk to anyone
16   on that Friday night that she wanted to review and
17   me to tell what and when I was going to make
18   another payment.  I told her I wasn't because I had
19   paid it off on that Friday night I went and sent
20   the money order.
21   Q.      Do you remember how much that final payment
22   was for?
23   A.      I'm thinking I was behind.  I'm thinking it
24   was around $350 or maybe a little more or a little
25   less.  I'm thinking that there was some behind.
```

Case 2:11-cv-00288-JRG-DHI  Document 83-1  Filed 11/19/13  Page 45 of 69  PageID #: 905

# RETAIL INSTALLMENT CONTRACT & SECURI...

| ACCOUNT NO. | 63010 | DATE OF CONTRACT 09/28/01 |

```
                                                    9  7  0  1
                                              103 - MELVIN WILLIAM H
BUYER(S)        WILLIAM H MELVIN          CREDITOR
Name(s)         107 CANNON AVE           (SELLER)                        ...ACE...MIT
and             BRISTOL TN 37620         Name & Address   340 VOLUNTEER PKWY
Address(es)                                              BRISTOL TN 37620
```

You may buy the vehicle described below for cash or on credit. The cash price is shown below as the "Cash Price". The credit price is shown below as the "Total Sale Price". You have elected to buy the vehicle and related goods described below for the Total Sale Price. This is the contract which covers this purchase. The terms and conditions are contained on both sides of this contract, so read both sides carefully and ask us any questions. By signing this contract, you agree to its terms and conditions and acknowledge having received delivery of the vehicle and related goods in their present condition. We use "you" and "your" to mean the Buyer and anyone else who signs this contract. "We", "us", and "our" mean the Seller or anyone to whom this contract is transferred or assigned.

| NEW or USED | Year of Model | MAKE | NO. CYL | SERIES, MAKE OR TRADE NAME (Also "No." if applicable) | AUTO-Body Type (if truck, love capacity) | VEHICLE IDENTIFICATION NO. (Serial or Motor No.) |
|---|---|---|---|---|---|---|
| USED | 1998 | MITSUBISHI | | GALANT | 4DR | 4A3AJ5560WE079567 |

| EQUIPMENT INCLUDED (Describe) | ☐ Radio ☐ Tape Deck ☐ Air Cond. ☐ Automatic Trans. ☐ Power Steering ☐ Power Brakes ☐ Power Seats ☐ Power Windows ☐ Other |

| Will be kept at | 107 CANNON AVE | County | State TN |

## INSURANCE

**You are required** to insure the vehicle against loss or damage. Physical Damage or Property Insurance and Vendor's Single Interest Insurance are required and may be provided by anyone you choose or you may provide it through a policy you already have. If you get the insurance checked below from us, the cost will be as shown.

☐ Comprehensive $ N/A Deductible
Premium $ N/A Term N/A Months

☐ Collision $ N/A Deductible
Premium $ N/A Term N/A Months

☐ Coverages per Attached Quote made a part of this Contract.

☐ Vendor's Single Interest
Premium $ N/A Term Months

☐ Limited Physical Damage
Premium $ N/A Term N/A Months

$ N/A Term Months

**This contract does not include liability insurance coverage for bodily injury and property damage caused to others.**

**USED MOTOR VEHICLE BUYERS GUIDE.** If you are buying a used vehicle with this contract, federal regulations may require a special Buyer's Guide to be displayed on the window of the vehicle.

**NOTICE: The information you see on the window form for this vehicle is part of the contract. Information on the window form overrides any contrary provisions in the contract of sale.**

## ITEMIZATION OF AMOUNT FINANCED

| | | $ 11432.03 |
|---|---|---|
| 1. Cash Price | | $ 11432.03 |
| Cash Down Payment.............$ 100.00 | | |
| Rebate..............................$ N/A | | |
| Trade-In (Year & Make) 1988 CHEVROLET | | |
| Allowance: Gross $ 1000.00 | | |
| Amount Owing $ N/A Net $ 1000.00 | | |
| 2. Total Down Payment | | $ 1100.00 |
| 3. Unpaid Balance of Cash Price (1 minus 2) | | $ 10332.03 |
| Paid to Others (We may retain a portion of the amount): | | |
| Paid to Public Officials for: License, Title & Registration Fees........$ 32.00 | | |
| a. To ........................$ N/A | | |
| b. To ........................$ N/A | | |
| c. To ........................$ N/A | | |
| To Insurance Companies for: | | |
| d. Single Credit Life Insurance......$ N/A | | |
| e. Joint Credit & Health Insurance ...$ N/A | | |
| f. Accident & Health Insurance .....$ N/A | | |
| g. Property Insurance ...........$ N/A | | |
| h. Vendor's Single Interest Ins ....$ N/A | | |
| i. Limited Physical Damage Ins ...$ N/A | | |
| 4. Total Paid to Others (a+b+c+d+e+f+g+h+i) | | $ 32.00 |
| 5. Amount Financed (3 + 4) | | $ 10364.03 |

## CREDIT LIFE AND CREDIT ACCIDENT AND HEALTH INSURANCE

CREDIT LIFE AND CREDIT ACCIDENT AND HEALTH (A & H) INSURANCE IS NOT REQUIRED TO OBTAIN CREDIT. IT WILL NOT BE PROVIDED UNLESS YOU AGREE TO PAY THE PREMIUM BY CHECKING THE COVERAGE(S) YOU (THE FIRST PERSON NAMED ABOVE) WANT AND SIGNING THE INSURANCE AUTHORIZATION BELOW. THE PREMIUM INCLUDES COVERAGE FOR THE TERM OF THE CONTRACT. INSURANCE IS NOT AVAILABLE IF YOU ARE AGE 65 OR OVER. FOR A&H INSURANCE YOU MUST BE NOW EMPLOYED AT LEAST 30 HOURS PER WEEK.

| Single Credit Life Insurance Premium $ N/A | Initial Amount of Life Insurance $ N/A | ☐ You want Single Credit Life Insurance on yourself. |
|---|---|---|
| | | 09/28/01 |
| | | Date     SIGNATURE OF PERSON FIRST NAMED ABOVE |

| Joint Credit Life Insurance Premium $ N/A | Initial Amount of Life Insurance $ N/A | ☐ You want Joint Credit Life insurance on yourself |
| | | and N/A    N/A |
| | | Date of Birth |
| | | 09/28/01 |
| | | Date     SIGNATURE OF PERSON FIRST NAMED ABOVE |

| A & H Premium $ N/A | A & H Monthly Benefit $ N/A | ☐ You want A & H Insurance on yourself. |
| Your age 49 | and date of birth 09/05/52 | 09/28/01 |
| | | Date     SIGNATURE OF PERSON FIRST NAMED ABOVE |

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you, or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $ 1100.00 |
|---|---|---|---|---|
| 24.00 % | $ 7560.37 | $ 10364.03 | $ 17924.40 | $ 19024.40 |

### YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| | $ N/A | |
| 60 | $ 298.74 | Monthly Beginning 11/01/01 |
| | $ N/A | |

**SECURITY:** You are giving a security interest in the vehicle and goods being purchased.

**LATE CHARGE:** If a payment is more than 5 days late, you will be charged 5% of the unpaid amount of the past due payment.

**PREPAYMENT:** If you pay off early, you may be entitled to a refund of part of the finance charge.

See your contract documents for additional information about non-payment, default, any required payment in full before the scheduled date, and prepayment refunds and penalties.

## TERMS AND CONDITIONS (ADDITIONAL TERMS ON REVERSE SIDE)

**PROMISE TO PAY:** You agree to pay us the amount shown as "Total of Payments" in accordance with the payment schedule shown above. This amount is payable in consecutive monthly payments commencing on the first due date shown above and on the same day of each succeeding month, until fully paid.

**SECURITY INTEREST:** You give us, and assign to us, a security interest in the vehicle and the goods purchased which are described above. The security interest extends to all proceeds of and accessions to such vehicle and goods. You also assign to us any proceeds not in excess of the unpaid balance under this contract including returned or unearned premiums which may become payable through insurance on the property or written in connection with this contract, including returned or unearned premiums.

**LATE CHARGE:** If any payment is more than 5 days past due, you agree to a late charge equal to 5% of the unpaid amount of the past due payment.

**PREPAYMENT:** You may prepay this Contract in full at any time without penalty and we will refund or credit the unearned portion of the finance charge computed by the Rule of 78's, less an acquisition charge of $25.00. No refund of less than $1.00 will be made.

Accepted by Seller and unless checked here ☒ this contract is hereby assigned under the terms of the assignment on the reverse side to: (ASSIGNEE)

TRANSOUTH
ADDRESS
1332 VOLUNTEER PARKWAY
CITY    STATE    ZIP CODE
BRISTOL TN 37620
NAME OF SELLER
WALLACE IMPORTS, INC. D/B/A WALLACE MITSUBISHI
BY _Judy Mg Mgr_

**NOTICE TO BUYER:**
Do not sign this contract before you read it or if it contains any blank spaces. You are entitled to a copy of this contract. The Buyer acknowledges receipt of an exact copy of this contract.

BUYER _William H Melvin_
BUYER

## CO-OWNER OF COLLATERAL AGREEMENT

Although Co-Owner is not liable for payment of the indebtedness evidenced by this contract, Co-Owner grants the Seller, its successors and assigns, a security interest in the Collateral described above in accordance with the terms of this contract and agrees to be bound, to the extent not prohibited by law, by all the terms of this contract until such time as the Buyer has performed all of Buyer's obligations under the contract.

| X_____(SEAL) | _____ | X_____(SEAL) | _____ |
| CO-OWNER OF COLLATERAL | DATE | CO-OWNER OF COLLATERAL | DATE |

**NOTICE: THIS CONTRACT CONTAINS AN ARBITRATION PROVISION... IMPORTANT INFORMATION ON REVERSE SIDE.**
SSI029 (OLD 056364) Rev. 2/01 TENNESSEE MOTOR VEHICLE

EXHIBIT F

CONFIDENTIAL     TNCONS0000659

## ADDITIONAL TERMS

**BAD CHECK FEE:** If you agree to pay us a bad check charge in an amount equal to the actual charge imposed on us.

**DEFAULT:** You will be in default if you fail to pay a payment when due or fail to keep the promises you've made in this Contract. Subject to any requirements of law and your right to cure, you hereby waive your right to all notices and demands, including without limitation demand for payment, presentation for payment, notice of intent to accelerate maturity, notice of maturity having been accelerated, protest and notice of protest. If you are in default, we can without notice or demand declare the entire amount you owe due and payable at once, less the refund described above in the paragraph entitled "Prepayment."

**INSURANCE ON THE VEHICLE:** You agree to keep the vehicle in good condition and insured against loss or damage. You can do this through any insurance you select but you must make the policy payable to us to the extent of our interest and provide us with evidence that you are maintaining such insurance during the term of this contract. If you have obtained insurance from us, the premium we have shown may be subject to change when the policy is issued. If the premium is less, we will give you credit. If the premium is more, you will have to pay us the difference. You direct any insurance company to make payments directly to us and authorize us to endorse any draft. If you fail to keep the vehicle insured or fail to provide us with evidence that the required insurance coverage is being maintained, we may, but shall not be required, to obtain substitute insurance which may be substantially equivalent to or more limited than the coverage you are required to maintain. Any substitute insurance coverage may, at our option only, insure our interest and not your interest in the vehicle. If we elect to obtain any such substitute insurance coverage, you will be obligated to pay us the additional cost for such insurance on demand, but we may at our option add the amount of such premium to your account.

**EXCLUSION OF WARRANTIES:** You understand that Seller makes no implied warranties of merchantability, fitness for a particular purpose, or any other warranties, express or implied, covering the vehicle or goods purchased unless:

1. It is of a type normally used for personal use, and
2. Seller extends a written warranty or service contract within 90 days from the date of this contract.

If Seller extends a written warranty or service contract within 90 days from the date of this contract, any implied warranty which may apply to the purchased property will last only as long as the written warranty or service contract.

**REPOSSESSION:** If you are in default, we can ask you to deliver the vehicle and goods to us or we may without notice or demand or legal process peaceably enter any premises, but not into any dwelling, where the vehicle and goods may be found and peaceably take possession of the vehicle and goods. We won't be responsible for any of your property that is not covered by this agreement that you leave inside the vehicle, but we'll try to return it to you.

**SALE OF REPOSSESSION:** If we repossess the vehicle and goods, we can sell them and apply the money received to what you owe us. This includes the cost of taking, storing, and preparing for sale. If the sale does not bring what you owe us, you will pay us this shortage at once if we have complied with the applicable provisions of Tennessee law. If the sale brings more than you owe us, we will pay the excess to you unless we're required by law to pay it to someone else.

**BUYER'S AGREEMENTS:** You agree to pay all taxes, assessments, and insurance due on the vehicle and goods and to keep them free of all liens. Although our security interest extends to the proceeds of the vehicle and goods, you agree not to sell, abandon, or otherwise dispose of them without our written consent. You understand that the Seller will not be assignee's agent to receive payments or for any other purpose. Loss or destruction of the vehicle and goods shall not relieve you of your obligation to pay us.

**OUR RIGHTS:** If you don't pay any taxes or assessments on the vehicle and goods as they become due, we may but are not required to do so ourselves. If we choose to do this, you will pay us this cost on demand, but we may at our option add this cost to your account. If the cost of taxes, fines, or assessments, or the premium for insurance is added to your account, such amounts shall be subject to interest at the annual percentage rate which applies to this contract and be payable in monthly installments along with the payments shown on the payment schedule. We can delay enforcing any of our rights under the contract any number of times without losing them. We can apply any amount we receive from you first to accrued charges. You agree that all this is okay with you.

**APPLICABLE LAW:** Questions about this agreement will be settled by Tennessee law, except as modified or preempted by Federal law and regulations, and we shall have all rights and privileges granted by the Uniform Commercial Code.

## NOTICE OF PROPOSED CREDIT INSURANCE

The front of this contract is marked to show if credit insurance applies to it. As shown by the marking, one or two kinds may apply. One is group credit life insurance, the other is group credit accident and health insurance. The insurer is Associates Financial Life Insurance Company. The insurer may accept or reject the insurance. The insurance covers only those who sign the request for insurance, but only the borrower is eligible for group credit accident and health insurance. The charge is shown for each type of insurance to be bought. The term of insurance will begin on the date the debt begins. It will end on the date the debt is first set to end unless it is terminated prior to that date. If the insurer accepts the insurance, the insured will receive from the insurer a certificate of insurance within 30 days. This will more fully describe the insurance. It will state any limits on coverages. If the debt is prepaid, a refund of the insurance charges will be made when due.

7674343

---

## NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

If this contract covers a sale other than a consumer credit sale, the above notice does not apply. This means that you must settle all claims, set-offs and defenses against the original Seller. You cannot assert them against the assignee.

## ARBITRATION

THIS ARBITRATION PROVISION SIGNIFICANTLY AFFECTS YOUR RIGHTS IN ANY CLAIM OR DISPUTE WITH US. PLEASE READ THIS ARBITRATION PROVISION CAREFULLY BEFORE YOU SIGN THIS CONTRACT.

EITHER YOU (Buyer) OR WE (Seller) MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US, EXCEPT AS PROVIDED BELOW, DECIDED BY ARBITRATION. IF ARBITRATION IS CHOSEN, YOU AND WE WILL EACH GIVE UP OUR RIGHT TO A TRIAL BY THE COURT AND/OR A JURY TRIAL. IF ARBITRATION IS CHOSEN, YOU MAY NOT SERVE AS A CLASS REPRESENTATIVE OR PARTICIPATE IN ANY CLASS MEMBER IN ANY CLASS ACTION AGAINST ANY PARTY ENTITLED TO COMPEL ARBITRATION UNDER THIS PROVISION.

Any claim or dispute, except as provided below, whether in contract, tort or otherwise (including, without limitation, interpretation and the scope of this provision, the arbitrability of any issue and matters relating to the consummation, servicing, collection or enforcement of this contract) between you and us or our employees, agents, successors or assigns which arise out of or relate to this contract or any resulting transaction or relationship including any such relationship with third parties who do not sign this contract shall, at your or our election (or the election of any such third party) be resolved by neutral, binding arbitration and not by court action. Any claim or dispute is to be arbitrated on an individual basis and not as a class action, and you expressly waive any rights you may have to arbitrate a class action. The Federal Arbitration Act governs this Arbitration Provision. Notwithstanding this Arbitration Provision, you and we can not require the other to arbitrate the following matters: (1) our respective rights, if any, to exercise self-help remedies; (2) seeking provisional remedies to enforce our security interest from a court; (3) any action brought in small claims court when it remains in such court and asserts claims on an individual basis seeking $15,000 or less; and/or (4) any action where all parties collectively, including multiple named parties, seek monetary relief in the aggregate of $15,000 or less in total relief including but not limited to compensatory, statutory or punitive damages, costs and attorney fees. Neither you nor we waive the right to arbitrate by exercising self-help remedies, filing suit, or seeking or obtaining provisional remedies from a court.

The arbitration proceeding will be conducted by either JAMS/ENDISPUTE, Inc. ("JAMS") or American Arbitration Association ("AAA"). Whoever first demands arbitration may choose either of these arbitration organizations, and such arbitration will be conducted in accordance with the rules of the chosen organization. The arbitration rules and demand for arbitration forms for JAMS may be obtained by calling 1-800-448-1650 and for AAA may be obtained by calling 1-800-778-7879. We will pay the filing fee to start arbitration and all arbitration costs and fees assessed by the chosen arbitration organization for the arbitration proceeding up to a maximum of one day (5 hours) of hearings. The applicable Arbitration rules will determine who pays other costs and fees, such as costs of the arbitration proceeding that go beyond one day of hearings, expert witnesses, travel costs, and attorney fees. This Arbitration Provision is binding upon and inures to the benefit of our respective heirs, successors, and assigns.

## TERMS OF SELLER'S ASSIGNMENT

You (Seller) sell and assign all of your right, title and interest in the above contract and all your interest in the collateral shown on the front side of the contract (referred to as "we", "us", and "our" in this Assignment) without recourse as to Buyer's obligation of payment, except as may be provided in any underlying agreement between us. You give us full power to collect and discharge the contract and to take all legal or other proceedings as you may take, except for this Assignment. You warrant and certify all of the following: (a) The contract arises from the sale of the vehicle and goods and/or services described on the face of the contract; (b) You had clear title to the vehicle and goods at the time of sale; (c) The vehicle and goods described have been delivered by you to Buyer(s) and/or the services described have been rendered by you to Buyer(s) and Buyer(s) have accepted them without complaint; (d) The vehicle and goods and/or the services sold satisfy any warranties made or implied as to them and are not defective; (e) The contract and any guaranty are genuine, legally valid, and enforceable; (f) Each of the Buyers was of lawful age and had full capacity to make this contract; (g) All insurance documentation will be delivered to Buyer(s) within the time required by law; (h) Buyer(s) was quoted the cash price and the total sale price as stated in the contract; (i) No part of the downpayment shown as paid in cash is owing by loan or note and any trade-in shown was received by you for the allowance shown in the contract; (j) All statements by Buyer(s) on any forms related to the contract are true to your knowledge and belief; (k) This written contract is the entire agreement between you and Buyer(s); (l) You convey good title to the contract and you have not granted any security interest in this contract nor suffered or incurred any liens against the contract or the collateral; (m) You have complied in good faith with all disclosure requirements and provisions of State and Federal laws and regulations applicable to this contract; (n) You are licensed as required by law; (o) The security interest in the collateral has been duly perfected within ten (10) days from the date of contract and accurately describes the collateral; (p) The finance charge and annual percentage rate are in compliance with the rates prescribed by law.

All warranties are made to induce us to purchase the contract. If there is a breach of any warranty or if Buyer(s) has any defenses against you and asserts them against us, you will on demand purchase this contract from us for the then remaining unpaid balance plus all losses and expenses we've paid or incurred in connection with the contract. If we sustain any loss or damage by reason of any claim or defense Buyer(s) has against you and asserts against us, you'll indemnify us and hold us harmless from all loss and damage we may sustain because of such claim or defense. This includes our reasonable lawyer's fees and other expenses.

You waive all demand and notices of default and any other notices otherwise required by law. You agree that we, without notice to you, may release, extend, vary or modify any obligations of Buyer(s) or any other obligor or any rights against Buyer(s) or any other obligor without affecting any of your obligations under this Assignment. No waiver by us of any default or misrepresentation shall be effective unless in writing nor operate as a waiver of any other default or misrepresentation or of the same default or misrepresentation on a future occasion. This Assignment shall be binding upon the respective heirs, executors, administrators, successors and representatives of the parties to this Assignment.

If you execute any endorsement covering this transaction, the words "without recourse as to Buyer's obligation of payment" are deemed deleted, and, notwithstanding the provisions of any underlying agreement, our recourse as to you on this Assignment shall be as stated in such endorsement.

## SELLER'S ENDORSEMENT

If either of the two paragraphs set forth below is checked, and the endorsement is executed by the Seller, then the provisions of the paragraph checked shall become a part of the above Assignment and the words "without recourse to Buyer's obligation of payment" in the above Assignment shall be deemed to be deleted.

☐ 1. REPURCHASE: If we repossess the vehicle, you will upon our demand repurchase the contract for the then unpaid balance, provided the vehicle is surrendered within ninety (90) days after maturity of the earliest installment still wholly in default.

(Initial) _____

☐ 2. WITH RECOURSE ASSIGNMENT: You guarantee payment of the unpaid balance of the said contract as sold when the same shall become due, and you warrant that the contract is genuine, legally valid and enforceable and waive notice of acceptance of this guaranty and of defaults under the contract, and consent that we may, without affecting your liability, compromise or release, by operation of law or otherwise, any rights against and grant extensions of time of payment to Buyer(s) and other obligors.

(Initial) _____

SIGNATURE OF SELLER APPLICABLE IF TO PARAGRAPH, IF ANY, CHECKED ABOVE

BY: _____  TITLE: _____

CONFIDENTIAL

TNCONS0000660

## Part 1: Principal Balance Calculation

| | |
|---|---|
| Effective Date | 03/18/2004 Date Format: MM/DD/YYYY |
| Maturity Date | 10/01/2006 Date Format: MM/DD/YYYY |
| Original APR | 24.00 |
| Original Term | 60 |
| Original Finance Charge | $7,560.37 |
| Current Balance | $12,883.78 |
| Cramdown Amount | $0.00 |
| CPI - Premium Refund | $1,241.00 |
| CPI - Finance Charge Refund | $0.00 |
| | |
| Principal Balance | $9,301.01 |

## Part 2: Payment Calculation

| | |
|---|---|
| Effective Date | 03/18/2004 Date Format: MM/DD/YYYY |
| First Payment Date | 05/01/2004 |
| New APR | 12.00 |
| Remaining Term | 45 |
| Late Charges Due | $14.93 |
| NSF Fees Due | $0.00 |
| Extension Fees Due | $0.00 |
| | |
| Payment Schedule | 45 @ 259.2 |

## Part 3: Amendment Information

| | |
|---|---|
| Customer's Name | WILLIAM H MELVIN |
| Account Number | '9701 |
| Original Date of Loan | 09/28/2001 |
| | |
| Total Amount Due | $9,315.94 |
| Principal Balance | $9,301.01 |
| Finance Charge | $2,362.99 |
| Total of Payments | $11,664.00 |
| Total Fees Due | $14.93 |
| Extension Fees Due | $0.00 |
| | |
| Interest Start Date | 03/18/2004 |
| First Payment Date | 05/01/2004 |
| Maturity Date | 01/01/2008 |
| | |
| APR | 12.00 |
| Term | 45 |
| Payment Schedule | 45 @ 259.2 |





EXHIBIT
G

THIS AMENDMENT AGREEMENT is made and takes effect as of the 18th day of March, 2004, by and between TranSouth Financial Corporation ("Company"" or "We or Us"), and WILLIAM H. MELVIN ("Borrowers" or "You or Your") relating to a Motor Vehicle Retail Installment Sale Contract or promissory note and security agreement dated September 28, 2001, and having account number '97-01 (the "Contract") .

Company and Borrowers  acknowledge that the total amount due and owing under the Contract as of the above date is $9315.94 (the "Total Amount Due") comprised of:

Unpaid Principal balance or net balance (less unearned finance charges) of $9301.01;
Unpaid interest of $0.00; and
Unpaid fees (such as late fees, NSF fees) of $14.93
Unpaid extension fees of $0.000.

Borrower(s) hereby promise to pay to the order of Company, the Total Amount Due, together with interest on the Unpaid Principal Balance, as exists from time to time, at the rate of  12.00%  per annum after the date hereof until maturity, as follows:

In 45 monthly installments of $259.20 beginning May 1, 2004, and continuing until January 1, 2008, when the final payment will be due.

The final payment will be for any unpaid principal balance and accrued interest not yet paid as of such date together with any other sums, including unpaid extension fees, then payable under the Contract, as modified herein. Each installment shall be applied first to Unpaid Fees, then to accrued but unpaid interest (including Unpaid Interest) and the remainder of each installment, if any, shall be applied to the reduction of principal.  Borrower(s) agree that this Amendment shall in no manner affect or impair the Contract, the purpose of this instrument being simply to extend or modify the time or manner of payment of said Contract and indebtedness and to carry forward the lien securing same, which is acknowledged by the Borrower(s) to be valid and subsisting.  The Borrower(s) further agrees that all terms and provisions of the original Contract shall be and remain in full force and effect as written, except as otherwise expressly provided for herein.

THIS AMENDMENT AGREEMENT CONTAINS AN ARBITRATION PROVISION WHICH SIGNIFICANTLY AFFECTS YOUR RIGHTS IN ANY CLAIM OR DISPUTE WITH US. PLEASE READ THE ARBITRATION PROVISION ON PAGE 2.

If Company requires the consent to this Agreement by any additional party, Borrower(s) agree to obtain such consent, and this Agreement will not be effective if such consent is not obtained.  Borrower(s) agrees that this Agreement is void if Company has not received a signed original of this Agreement on or before April 1, 2004.

The Borrowers acknowledge that credit insurance, if any, purchased in connection with the original Contract will continue to cover only the coverage described in the certificate of insurance, such that extending the maturity of the Contract does not extend credit insurance coverage.

THIS ARBITRATION PROVISION SIGNIFICANTLY AFFECTS YOUR RIGHTS IN ANY CLAIM OR DISPUTE WITH US. PLEASE READ THIS ARBITRATION PROVISION CAREFULLY BEFORE YOU SIGN THIS AGREEMENT.

Mar-24-04 05:37pm From-BRISTOL TN 1018                4237848327        T-482  P.03/03  F-904
Mar-22-2004 07:55pm From-ARCADIA/TRANSOUTH FINANCIAL

BAD COPY

EITHER BORROWER(S) OR COMPANY MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US, EXCEPT AS
PROVIDED BELOW, DECIDED BY ARBITRATION. IF ARBITRATION IS CHOSEN, YOU AND WE WILL EACH
GIVE UP OUR RIGHT TO A TRIAL BY THE COURT AND/OR A JURY TRIAL. IF ARBITRATION IS CHOSEN,
YOU MAY NOT SERVE AS A CLASS REPRESENTATIVE OR PARTICIPATE AS A CLASS MEMBER IN ANY
CLASS ACTION AGAINST ANY PARTY ENTITLED TO COMPEL ARBITRATION UNDER THIS PROVISION.

Any claim or dispute, except as provided below, whether in contract, tort or otherwise (including, without limitation,
interpretation and the scope of this provision, the arbitrability of any issue and matters relating to the consummation,
servicing, collection or enforcement of this contract or note) between you and us or our employees, agents, successors or
assigns which arise out of or relate to this contract or note or any resulting transaction or relationship including any such
relationship with third parties who do not sign this contract or note shall, at your or our election (or the election of any
such third party) be resolved by neutral, binding arbitration and not by court action. Any claim or dispute is to be
arbitrated on an individual basis and not as a class action, and you expressly waive any rights you may have to arbitrate a
class action. The Federal Arbitration Act governs this Arbitration Provision.

Notwithstanding this Arbitration Provision, you and we can not require the other to arbitrate the following matters: (1) our
respective rights, if any, to exercise self-help remedies; (2) seeking provisional remedies to enforce our security interest
from a court; (3) any action brought in small claims court which remains in such court and asserts claims on an individual
basis seeking $15,000 or less; and/or (4) any action where all parties collectively, including multiple named parties, seek
monetary relief in the aggregate of $15,000 or less in total relief including but not limited to compensatory, statutory or
punitive damages, costs and attorney fees. Neither you nor we waive the right to arbitrate by exercising self-help
remedies, filing suit, or seeking or obtaining provisional remedies from a court.

The party initiating arbitration must choose one of the following organizations and follow its rules for initiating and
pursuing arbitration:

| | | |
|---|---|---|
| JAMS<br>1920 Main Street, Suite 300<br>Irvine, CA 92610<br>www.jamsadr.com | American Arbitration Association<br>335 Madison Avenue, Floor 10<br>New York, NY 10017-4605<br>www.adr.org | National Arbitration Forum<br>P.O. Box 50191<br>Minneapolis, MN 55405<br>www.arbitration-forum.com |

You may obtain a copy of the arbitration rules and a form for demanding arbitration by contacting one of the above
organizations or by accessing their Internet web site. The party making demand upon one of the organizations for
arbitration shall pay to such organization the filing fee required by the applicable rules when the demand is made,
except that Company will pay the amount of the filing fee in excess of the amount of the fee that would be required for
You to file a lawsuit in Your jurisdiction. In addition, We will pay to the Administrator all other administrative costs
of the arbitration proceeding. The applicable arbitration rules will determine who pays other costs and fees, such as costs
of the arbitration proceeding that go beyond one day of hearings. Each party shall pay their own attorney, expert, and
witness fees and expenses, unless otherwise required by law or by other terms of this agreement. This Arbitration
Provision is binding upon and inures to the benefit of our respective heirs, successors, and assigns.

IN WITNESS WHEREOF, the parties hereto agree to the terms of this Amendment Agreement.

TransSouth Financial Corporation                    Borrower: _B. J. W. Molen_____

By: _____                        Co-Borrower: _____

Its _____

~9701

2

J.G.

PYOD LLC,

        Plaintiff

   vs.

William H Melvin

        Defendant(s)

---

## PLAINTIFF'S AFFIDAVIT OF INDEBTEDNESS AND OWNERSHIP OF ACCOUNT

I am an Authorized Representative for PYOD LLC (hereafter the "Plaintiff") and hereby certify as follows:

1. I have personal knowledge regarding Plaintiff's creation and maintenance of its normal business records, including computer records of its accounts receivables. This information was regularly and contemporaneously maintained during the course of the Plaintiff's business. I am authorized to execute this affidavit on behalf of Plaintiff and the information below is true and correct to the best of my knowledge, information and belief based on the Plaintiff's business records.

2. The records provided to Plaintiff have been represented to include information provided by the original creditor. Such information includes the debtor's name, social security number, account balance, the identity of the original creditor and the account number.

3. Based on the business records maintained on account     '9701 (hereafter "Account") which are a compilation of the information provided upon acquisition and information obtained since acquisition, the Account is the result of the extension(s) of credit to William H Melvin by CitiFinancial, Inc. on or after 9/28/2001 (the "Date of Origination"). Said business records further indicate that the Account was then owned by CitiFinancial, Inc.. CitiFinancial, Inc. later sold and/or assigned Portfolio 8259 to Plaintiff's assignor which included the Defendant's Account on 8/21/2007 (the "Date of Assignment"). Thereafter, all ownership rights were assigned to, transferred to and became vested in Plaintiff, including the right to collect the purchased balance owing of $5,344.20 plus any additional accrued interest.

4. To the best of my knowledge and belief, the Defendant is not a minor or mentally incompetent person.

5. Based on the business records maintained in regard to the Account, the above stated amount is justly and duly owed by the Defendant to the Plaintiff and that all just and lawful offsets, payments and credits to the account have been allowed. Demand for payment was made more than thirty days ago.

I affirm under penalty of perjury that the above facts are true and correct.

Tobie Griffin
September 1, 2010

The foregoing affidavit was signed to and subscribed before me this Wednesday, September 01, 2010.

(Notary Public)

S1012288

**EXHIBIT**

**H**

St... ...oster
Not... ...ublic
Stat... ...

St... ...ter
State of ... Carolina
My Comm. Exp. 08-15-2015

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| LORINDA SMITH | ) | NO. 2:11-CV-379 |
| | ) | |
| JOAN LEPAGE | ) | NO. 2:12-CV-1 |
| | ) | |
| GREG SWANSON | ) | NO. 2:12-CV-2 |
| | ) | |
| ALFRED HICKMAN | ) | NO. 2:12-CV-45 |
| | ) | |
| SAMUEL VOORHEES | ) | NO. 2:12-CV-77 |
| | ) | |
| ALICE SMITH | ) | NO. 3:11-CV-510 |
| | ) | |
| ROBERT BRADFORD | ) | NO. 2:11-CV-291 |
| | ) | |
| MARY SMITH | ) | NO. 2:11-CV-356 |
| | ) | |
| CARL SELLS | ) | NO. 2:11-CV-355 |
| | ) | |
| ANGELA FITCH | ) | NO. 2:12-CV-56 |
| | ) | |
| MILDRED DANIELS | ) | NO. 2:12-CV-155 |
| | ) | |
| PEGGY ROBERSON | ) | NO. 2:12-CV-168 |
| | ) | |
| KATHERYN CONNER | ) | NO. 2:12-CV-184 |
| | ) | |
| V. | ) | |
| | ) | |
| BUFFALOE & ASSOCIATES, PLC., | ) | |
| AT AL, | ) | |
| and LVNV FUNDING, LLC, ET AL, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM H. MELVIN | ) | |
| V. | ) | |
| PYOD, LLC, ET AL. | ) | |

_____
DEPOSITION OF TOBIE GRIFFIN
_____

GALLAGHER COURT REPORTING

864-234-5744                                    gcr@charter.net
**EXHIBIT I**
Case 2:11-cv-00288-JRG-DHI   Document 83-9   Filed 11/19/13   Page 52 of 69   PageID #:
912

10

1    Q    Okay.  When you turn in your hours, do you specify

2         on whose behalf you worked or just the number of

3         hours you worked in a given week?

4    A    Just the number of hours I work in a given week.

5    Q    And your paycheck is from Resurgent?

6    A    Yes.

7    Q    Would you look at paragraph 3 in Exhibit 2, the last

8         line.  Excuse me.  Exhibit 2, paragraph 3.  It says

9         "Such information includes debtor's name, Social

10        Security number, account balance, identity of

11        original creditor and account number."

12        It says "The records provided to plaintiff," which

13        is LVNV.  And I won't say Funding, LLC.  It's a

14        tongue twister.  The records provided to plaintiff

15        have been represented to include the data I just

16        listed.  That's paragraph 3 --

17   A    Yes.

18   Q    -- in a nutshell.  Now, at the time you executed

19        this, which was December 20, 2010, did you verify

20        the information in paragraph 3?

21   A    I can say I verified everything but the Social

22        Security number.

23   Q    Why would you not have verified the Social Security

24        number?

25   A    The Social Security number is not identified in the

GALLAGHER COURT REPORTING

864-234-5744                                    gcr@charter.net
Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 53 of 69   PageID #:
913

11

1      affidavit.

2   Q   Okay.  When you say you verified the other

3      information, what do you mean?  Or how did you

4      verify?

5   A   I verified the account information, as it is spelled

6      out in the affidavit, to our database.

7   Q   And would that be Exhibit 3?

8   A   Yes.

9   Q   Now, the information in Exhibit 3, with regard to

10     the items we just listed, including Social Security

11     number and the balance, came from the original

12     creditor.  Correct?  Do I understand the process?

13  A   I am sorry.  Can you repeat that?

14  Q   Yes, I will.  I will rephrase it and try to make it

15     clearer.

16     The original creditor is Citibank.  And when the

17     Sherman companies purchase accounts, they purchase

18     them in pools.  Correct?

19  A   I believe so.

20  Q   And the original creditor transfers or sends the

21     data that's referenced in your affidavit in an

22     electronic format.  Correct?

23  A   I believe so.

24  Q   And then that electronic data is updated into

25     Exhibit 3?

GALLAGHER COURT REPORTING

864-234-5744                                                    gcr@charter.net
Case 2:11-cv-00288-JRG-DHI   Document 83-1   Filed 11/19/13   Page 54 of 69   PageID #:
914

1   A   Yes.

2   Q   And then to verify, you look at Exhibit 3 to make

3       sure that the numbers, such as account number and

4       balance, et cetera, match up between affidavit and

5       Exhibit 3.  Is that the process?

6   A   Yes.

7   Q   Would that be the process you used for all of the

8       affidavits you signed?

9   A   Yes.

10  Q   Okay.  If things don't change, if it's a normal

11      process, we can maybe shorten things.

12  A   Okay.

13  MR. KOSTOLNIK:

14      Referring to the affidavits at issue in this case,

15      the ones that we have identified?

16  MR. MECHEM:

17      Yes.  The four that we are going to go over.

18  MR. KOSTOLNIK:

19      In which you're named a defendant in the federal

20      litigation.  So you understood that, it sounds

21      like.

22  THE WITNESS:

23      Yes.

24  EXAMINATION RESUMED BY MR. MECHEM:

25  Q   It's the four we will address.  But I am trying to

GALLAGHER COURT REPORTING
864-234-5744                                    gcr@charter.net
Case 2:11-cv-00288-JRG-DHI  Document 83-1  Filed 11/19/13  Page 55 of 69  PageID #:
915

34

1     The record should reflect the witness was referring

2     to Exhibit 2 during her answer.

3  MR. MECHEM:

4     That's fine.

5  EXAMINATION RESUMED BY MR. MECHEM:

6  Q   And so in this case Hosto requested an affidavit.

7     An affidavit was created.  Correct?

8  A   Yes.

9  Q   You signed that affidavit under penalty of perjury.

10     Correct?

11  A   Yes.

12  Q   Did you sign that affidavit in front of a notary?

13  A   Meaning was a notary standing right over me as I

14     signed it?

15  Q   Yes.

16  A   No.

17  Q   When did the notary put her seal to your affidavit?

18  MR. KOSTOLNIK:

19     Objection, foundation.

20  BY MR. MECHEM:

21  Q   If you know.  Do you know?

22  A   Within minutes of me finishing the request and

23     handing it to her.

24  Q   So describe how the signed copy of Exhibit 2 got

25     from you to the notary.

GALLAGHER COURT REPORTING
864-234-5744                                    gcr@charter.net
Case 2:11-cv-00288-JRG-DHI  Document 83-1  Filed 11/19/13  Page 56 of 69  PageID #:
916

STATE OF TENNESSEE, COUNTY OF SULLIVAN

To Any Lawful Officer to Execute and Return:

Summon  WILLIAM H MELVIN _____

To appear before the General Sessions Court of  SULLIVAN  County, Tennessee.

To be held in  GENERAL SESSIONS COURT  (Court Room)  801 Anderson St. Bristol, TN  37620  (Address) on the  7th  day of  February , 2011 , at  9:30 A.M.,  then and there to answer in a civil action brought by  PYOD LLC as assignee of Citifinancial. Inc.

For   Suit on a sworn account in the principal amount of $5,344.20  plus pre and post judgment interest accruing at the statutory rate of 10% and court costs of this cause of $114.50, and service of process fees in the amount of $25.00.

Under $  25,000.00  Dollars

Judgment for _____

Against _____

For $ _____  plus interest at the rate of _____  % and cost of suit, for which execution may issue.

Judgment entered by: ☐ Default ☐ Agreement ☐ Trial

Dismissed: ☐ Without prejudice ☐ With prejudice

Costs taxed to: ☐ Plaintiff ☐ Defendant

Defendant(s) _____

in court and admitted to jurisdiction of court. This the _____ day of _____ , 20 ____

_____ Judge, Division

This the _____ day of _____ , 20 ____

_____ , Judge

ADA Coordinator,

**SUMMONS CIVIL**

**JUDGMENT**

**ORDER**

---

Case No. _____

PYOD LLC as assignee of Citifinancial, Inc.

_____ Plaintiff(s)

vs.

_____ Defendant

WILLIAM H MELVIN _____

_____ Address

107 CANNON AVE
BRISTOL, TN 37620-5231
PH: 423/968-1465
SSN: xxx-xx-3139
Serve by Private Process
Henry Price

_____ Defendant

PH: _____ Address

SSN: xxx-xx- _____

**CIVIL WARRANT**
**Court of General Sessions**
Tommy R. Kerns, Clerk

By _____ , Deputy Clerk

Issued _____ , 20 ____

Set for  February 7th, 2011  At 9:30 A.M.

Reset for _____

Served Upon: ☐ All Named Defendants
☐ All Defendants

Except: _____

Served _____ , 20 ____

**SERVICE**

Sheriff/Constable (Process Server)

Buffaloe & Associates, PLC – Our File#  S1012288
201 4th Ave N., Ste 1300  Nashville, TN  37219
615/256-2642
Attorney for Plaintiff

_____ Attorney for Defendant

_____ Telephone

EXHIBIT
J

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| LORINDA SMITH | ) | NO. 2:11-CV-379 |
| JOAN LEPAGE | ) | NO. 2:12-CV-1 |
| GREG SWANSON | ) | NO. 2:12-CV-2 |
| ALFRED HICKMAN | ) | NO. 2:12-CV-45 |
| SAMUEL VOORHEES | ) | NO. 2:12-CV-77 |
| ALICE SMITH | ) | NO. 3:11-CV-510 |
| ROBERT BRADFORD | ) | NO. 2:11-CV-291 |
| MARY SMITH | ) | NO. 2:11-CV-356 |
| CARL SELLS | ) | NO. 2:11-CV-355 |
| ANGELA FITCH | ) | NO. 2:12-CV-56 |
| MILDRED DANIELS | ) | NO. 2:12-CV-155 |
| PEGGY ROBERSON | ) | NO. 2:12-CV-168 |
| KATHERYN CONNER | ) | NO. 2:12-CV-184 |
| V. | ) | |
| BUFFALOE & ASSOCIATES, PLC., AT AL, and LVNV FUNDING, LLC, ET AL, | ) | |
| and | ) | |
| WILLIAM H. MELVIN V. PYOD, LLC, ET AL. | ) | |

30(b)(6) DEPOSITION
OF BUFFALOE & ASSOCIATES, PLC.,
(By Joel A. Vallejo)

**EXHIBIT**
tabbies
K

2

```
DATE TAKEN:        Tuesday, July 23, 2013
TIME BEGAN:        1:00 p.m.
TIME ENDED:        4:30 p.m.
LOCATION:          Hilton Hotels & Resorts
                   45 West Orchard Park Drive
                   Greenville, South Carolina


REPORTED BY:       Elaine L. Grove-DeFreitas, RPR
                   Gallagher Court Reporting
                   864-234-5744
```

47

1     difficult.  I am not sure I understand the question.

2  Q   If the request for 10 percent discretionary interest

3     in the warrant is found to violate the FDCPA, then

4     you have an affirmative defense.  Right?  The BFE.

5     Correct?

6  A   Yes.

7  Q   So how would the BFE apply to the request for 10

8     percent interest if that's a violation?

9  MR. KOSTOLNIK:

10    Same objections.

11  BY MR. MECHEM:

12  Q   Or does it?  You tell me if it does or doesn't.

13  A   I think that we are allowed to request the 10

14     percent statutory interest.

15  Q   Okay.  That's a legal conclusion, so it's not a BFE

16     issue.  It's whether, in Tennessee and under federal

17     law you can legally request that in the warrant.

18     You don't have a procedure that says let's do this

19     with interest, do you, when we are filing warrants?

20  A   We have no specific procedure.  The only reason we

21     would request contract interest is if we had a

22     contract.  But other than that, no, it's

23     discretionary.

24  Q   And so if you don't have a contract, you make the

25     legal decision, when you file Mr. Voorhees' warrant,

1       to seek 10 percent discretionary interest?

2   MR. KOSTOLNIK:

3       Object to the form.

4   WITNESS ANSWERS:

5   A   Yes.

6   Q   Okay.  And again, I am just trying to find out what

7       sections you have procedures that apply to the

8       allegations in the complaint, because you have

9       raised it as an affirmative defense.

10  A   Sure.  Number 26, like I said, that was fairly

11      general, though.

12  Q   Okay.  I think, for me, the earlier discussion

13      covered that.

14  A   Number 28.  Again, it is a general one.

15  Q   How would you have a procedure?  I mean, that's --

16      how would you have a procedure that says let's

17      dismiss, let's don't dismiss?

18  A   I'm sorry.  It's not a procedure.  It's we pursued

19      it.

20  Q   So you're denying the allegation?

21  A   Yes.  Sorry.

22  Q   No, I understand.  If you want to admit to the

23      complaint, you can.  I am not seeking, you know,

24      reaffirmation of denials.  I am seeking areas where

25      you have procedures in place that apply to my

| | |
|---|---|
| PYOD LLC as assignee of Citifinancial, | ) |
| | ) |
| Plaintiff, | ) Civil Action BC000860 |
| | ) |
| vs. | ) |
| | ) |
| WILLIAM H. MELVIN, | ) |
| | ) |
| Defendant. | ) |

## SWORN DENIAL

STATE OF TENNESSEE ) 
COUNTY OF SULLIVAN )

    I, the Defendant, William H. Melvin, having first been duly sworn and upon oath, deposes and says as follows:

1. I am the Defendant in this civil proceeding.

2. I have read the Civil Warrant and Summons and affidavit brought by Plaintiff to answer in a civil action brought by PYOD LLC for suit on a sworn account in the principal amount of $5,344.20 plus pre and post judgment interest accruing at the statutory rate of 10% and court costs of this cause of $114.50 and service of process in the amount of $25.00.

3. I do not have an agreement with PYOD, LLCfor the repayment of debt or otherwise.

4. I do not believe that I owe any money to PYOD, LLC.



EXHIBIT
L

TNCONS0000649

Date: __10, 3, 10__                BY: _William H Melvin_

William H. Melvin, Defendant

STATE OF TENNESSEE
COUNTY OF SULLIVAN

Subscribed and sworn to before me this 3rd day of _November_, 2010.

_____
Notary Public
My commission expires: __8/17/2013__

TNCONS0000650

# TENNESSEE
## COLLECTION SERVICE BOARD
### MINUTES

**DATE:**  May 9, 2012

**PLACE:**  Andrew Johnson Tower – 2nd Floor Conference Room
710 James Robertson Parkway
Nashville, Tennessee

**PRESENT:**  Board Members:
Bart Howard, Chairman
Elizabeth Trinkler, Vice Chairman
Elizabeth Dixon
Chip Hellmann

**PRESENT:**  Staff Members:
Donna Hancock, Executive Director
Laura Betty, Chief Counsel for the Division of Regulatory Boards
Chris Whittaker, Assistant General Counsel
Robyn Ryan, Assistant General Counsel
Susan Lockhart, Executive Assistant

**GUESTS:**  Terrance Bond

**CALL TO ORDER:**  Chairman Howard called the meeting to order at 9:30 a.m. and the following business was transacted:

**Roll Call -** Director Hancock called the roll and all four (4) members were present.

**Agenda –** Ms. Dixon made a motion to adopt the agenda, seconded by Ms. Trinkler. **MOTION CARRIED.**

**Minutes –** Mr. Hellmann made a motion to approve the minutes of the March 14, 2012 meeting, seconded by Ms. Dixon. **MOTION CARRIED.**

**Minutes –** Ms. Hancock advised it had recently been brought to her attention that the minutes from the teleconference held in August 2012 had never been submitted for approval per previous counsel but would like to do so at this time. Ms. Trinkler made a motion to approve the minutes of the August 2, 2011 teleconference, seconded by Mr. Howard. Mr. Hellmann and Ms. Dixon abstained from voting as they did not participate in the teleconference. **MOTION CARRIED.**

## CHRIS WHITTAKER, ASSISTANT GENERAL COUNSEL

Chairman Howard recognized and welcomed Chris Whittaker as the new Assistant General Counsel for the Board.

**EXHIBIT M**

Mr. Whittaker a brief history of his experience with the State of Tennessee and advised he also currently serves as the Assistant General Counsel for the Board of Accountancy. He then presented the following Legal Report for the Board's consideration:

1.  2012003061
2.  2012005861
3.  2012005841
4.  2012005881
5.  2012005891
6.  2012005901
7.  2012005911
8.  2012005921
9.  2012005931
10. 2012005941

All of the above-referenced cases involve licensees who have failed to provide proof of an adequate surety bond to the Board as required by law.

**Recommendation:** Close and issue a CEASE and DESIST notice advising the Respondent that it should cease operations in Tennessee until it provides proof of adequate surety bond coverage.

11.   2012000641

The complaint alleges that the Respondent failed to comply with T.C.A. § 62-20-114 by failing to provide an explanation as to why the Respondent's licensing application showed that the balance owed to clients at the end of every month was zero. Immediately upon learning of the complaint, the Respondent provided a written explanation to the Board, stating that the balance owed to clients is zero at the end of every month because the agency places all collected client funds into client trust accounts at the end of every month.

**Recommendation:** Dismiss the complaint.

12.   2012001431

This complaint centers around the attempted collection of funds owed as a result of payday advance loans taken out by the Complainant. The complaint alleges that the Respondent engaged in unlicensed collection activity and that the Respondent attempted to collect a debt that the Complainant does not know about. The investigation revealed that the Respondent does have a valid, active collection service license. Additionally, it is not a violation of the law for a licensee to attempt to collect a debt that the debtor "does not know about". Further, there is no evidence that the Complainant asked the Respondent to validate the debt, and the payday loan agreements signed by the Complainant specifically grant the debtor the right to report late payments, missed payments, and/or other defaults on the payday loan agreement to credit bureaus. While there is no evidence that the Respondent reported the debt at issue in this case to any of the three major credit bureaus, the Respondent did attempt to help the Complainant obtain information regarding the debt. The Respondent contacted the three major credit bureaus to request that any adverse credit entries on the Complainant's report regarding the debt in question be removed so as to allow the Complainant time to obtain sufficient information about the debt

to determine whether the debt is owed or not. In summary, the Complainant's complaint (as currently constituted) appears to state no claim upon which the Board may take disciplinary action against the Respondent.

**Recommendation:** Dismiss the complaint.

13. **2012001201**

The complaint alleges that the Respondent attempted to collect a debt that the Complainant did not owe. The investigation revealed that the creditor made a billing error on the Complainant's account, thereby resulting in the Respondent's good faith attempt to collect a debt which was later determined not to be owed by the Complainant. Although the Respondent did close the Complainant's account immediately upon learning that the Complainant did not owe the debt, the file contains no evidence that the Respondent attempted to validate the debt as requested by the Complainant.

**Recommendation:** Close with a Letter of Warning.

14. **2012003511**

The complaint alleges that the Respondent contacted the Complainant after receiving a letter from the Complainant stating that the debt in question was discharged in a bankruptcy proceeding and asking that the Respondent no longer contact him regarding the debt. The Respondent's internal investigation revealed that it did, in fact, receive the letter, but that the proper notation was not made in the Complainant's account because the Complainant's letter never made it to the person responsible for making such entries. The Respondent took full responsibility for the error, and it implemented a new procedure requiring that all "cease and desist communication" letters be signed for by the staff member(s) responsible for making notations to the accounts of debtors who have requested not to be contacted any further regarding debts assigned to the Respondent.

**Recommendation:** Close with a Letter of Warning.

15. **2012004021**

The complaint alleges that the Respondent attempted to collect a debt that the Complainant did not owe due to his identity being stolen. The investigation revealed that the Complainant requested that the Respondent verify the debt in writing within 30 days of receiving notice of the debt. Once the Complainant submitted a notarized identity theft affidavit to the Respondent, the Respondent did close the Complainant's account immediately upon learning that the Complainant did not owe the debt. Although the file contains no evidence that the Respondent attempted to validate the debt as requested by the Complainant, there does not appear to be any intent by Respondent to avoid communicating with the Complainant or to simply close the Complainant's account to evade regulatory action. Rather, it appears that the Complainant submitted his identity theft affidavit immediately after requesting verification of the debt. As such, the Respondent, recognizing that this debt related to identity theft, immediately closed the Complainant's account without verifying the debt. A Letter of Warning is appropriate

to advise the Respondent that, upon receipt of a timely, written request for verification of a debt, they should respond to it, even if the response is an explanation that is included with the notice to the alleged debtor that the debtor's account with the agency is being closed.

**Recommendation:** Close with a Letter of Warning.

16. **2012004631**

The Complainant alleges that the Respondent made threatening phone calls to the Complainant. The investigation revealed no evidence of threatening phone calls, showed that the collection letters sent to the Complainant are in compliance with applicable law, and revealed that the Respondent is continuing to track the Complainant's progress on the payment plan worked out between the Complainant and the debtor (with the Respondent making no further collection calls so long as the Complainant is compliant with the payment plan). Board member Elizabeth Trinkler must recuse herself from voting on the disposition of this matter due to potential personal knowledge of the subject matter of this complaint.

**Recommendation:** Dismiss the complaint.

17. **2012005141**

The complaint alleges that the Respondent made numerous harassing phone calls to the Complainant. The investigation revealed that the Respondent called the Complainant eleven (11) times before being able to speak with her. The Complainant stated that she had to make multiple phone calls (during which she had to speak with someone in the Philippines) and send an e-mail to the Respondent in order to notify them that they were calling a phone number that did not belong to the debtor from whom the Respondent was seeking to collect the debt at issue in this case. The Respondent stated that they obtained the Complainant's phone number from a third party vendor, but did not know it was a wrong number until the Respondent contacted them. The Respondent apologized for any inconvenience to the Complainant, made a note in their system that the phone number at which they called the Complainant was a wrong number, and immediately ceased all phone calls to the Complainant's phone number.

**Recommendation:** Close with a Letter of Warning stating that any future calls to the Complainant regarding this matter shall result in disciplinary action being pursued against the Respondent.

18. **2012006531** *(Ms. Trinkler recused herself per Counsel's request)*

The complaint alleges that the Respondent attempted to collect a debt from the Complainant which was not owed. The investigation revealed that, during the first and only phone call received by the Complainant, the Complainant advised the Respondent that the statute of limitations had run on the debt in question, and asked that the Respondent not contact him again in the future regarding this debt. The Complainant also sent a "cease and desist communication" letter to the Respondent regarding this debt. While the Complainant is correct that the expired statute of limitations means that he can't be successfully sued to collect the debt, the debt is still owed and a collection agency may attempt to collect the debt using non-litigation

collection methods (i.e., phone calls, letters, etc.). Immediately upon receiving the Complainant's "cease and desist communication" letter, the Respondent closed the Complainant's account and returned it to the original creditor.

**Recommendation:** Dismiss the complaint.

**MOTION:** Mr. Hellman made a motion to accept Legal's recommendation on all of the complaints as presented, seconded by Ms. Dixon. (Ms. Trinkler recused herself from voting on #16 – 2012004631 per Counsel's request). **MOTION CARRIED.**

*Ms. Ryan left the meeting at 9:55 a.m. upon conclusion of Mr. Whittaker's report.*

## ADMINISTRATIVE REPORT – DONNA HANCOCK, EXECUTIVE DIRECTOR

**Location Manager Exam Contract – Update** – Ms. Hancock introduced Laura Betty, Chief Counsel for the Division of Regulatory Boards. Ms. Betty advised that she has been working with Fiscal Services regarding the Board's contract for administering the location manager exam. She reminded the Board that there were no bids to the first Request for Proposal the Department issued 4/20/11 and this resulted in the Board calling for Emergency Rules regarding the examination fee that the vendor may charge the exam candidates. (Ms. Betty explained that after inquiring, it was found that by statute, the previous vendor declined to submit a proposal because the candidate exam fee was too low.) After the Emergency Rules were in place a second Request for Proposal was issued on 2/21/12. It also failed to receive any proposals.

Ms. Betty further advised that the new rule calling for a candidate exam fee to be negotiated between the board and exam vendor was presented to the legislative committee on Monday, May 7, 2012. The rule was passed and will become effective on June 20, 2012. The Department is now working with a new vendor on a "sole source" contract and working with the previous vendor on obtaining information concerning the previous examination questions. After some discussion, it was determined that the Board could meet via teleconference (given the required notice) to review the proposed exam candidate fee as soon as it is available. Ms. Hancock advised the Board that most likely there will be incurring costs for the new examination development which will result in an increase of expenditures on this fiscal year's budget.

*Ms. Betty left the meeting at 10:08 a.m. upon conclusion of her report concerning the Location Manager Exam Contract.*

**Consumer Financial Protection Proposed Rule – Response from NACARA** – Ms. Hancock presented a letter from the North American Collection Agency Regulatory Association (NACARA) to the Bureau of Consumer Financial Protection (BCFP) in response to and support of the Bureau's proposed rule defining "larger participants" in certain consumer financial product and service markets. She advised that since the Tennessee Collection Service Board is a member of NACARA, she wanted them to be aware of NACARA's positions on all debt collection issues.

**Complaint Status Report** - Ms. Hancock presented a comparison of the complaints pending in May 2011 to those currently pending.

## LOCATION MANAGER APPLICATION REVIEW

Ms. Hancock presented a request from Mr. **James D. Evans** asking the board to waive a requirement for him to retest on the Location Manager exam. Mr. Evans' license expired 12/31/10 and to return to the industry he must be relicensed and meet all licensing requirements. Mr. Evans passed the location manager exam in 2000 and the exam has not changed.

**James D. Evans** – Ms. Dixon made a motion to approve the waiver request, seconded by Ms. Trinkler. **MOTION CARRIED.**

Ms. Hancock then presented the following Location Manager Applications to the Board for consideration:

**Kevin Dean Wardlow** – Mr. Hellmann made a motion to approve the application, seconded by Ms. Dixon. **MOTION CARRIED.**

**Andrew N. Miller** – Ms. Trinkler made a motion to table the application and staff to request additional information. Seconded by Mr. Hellmann. **MOTION CARRIED.**

**Eddie Sanchez, Jr.** – Mr. Hellmann made a motion to deny the application pursuant to TCA 62-20-125(3), seconded by Ms. Dixon. **MOTION CARRIED.**

**Matthew T. Gascon.** – Ms. Trinkler made a motion to deny the application pursuant to TCA 62-20-125(3), seconded by Mr. Hellmann. **MOTION CARRIED.**

**NEW BUSINESS OR UNFINISHED BUSINESS:** Terrance Bond, Attorney at Law, appeared on behalf of Barry Gammons, PLLC. He inquired as to the Board's position regarding its current clarification statement listed on the Board's web site regarding debt/judgment purchasers and "passive" debt buyers. The Board reviewed the current statement and advised it would currently stand as written.

Mr. Bond then asked if a business operating as a debt buyer, unaware they should be licensed as a collection agency, would be given leniency or "safe harbor" if the Board became aware of said unlicensed practices. He said that the 'safe harbor' period could be limited to a specific time given to allow the business to become licensed. The Board advised that practices of this nature would be reviewed on a case by case basis and felt that they have historically offered leniency if the business demonstrates it is trying to do the right thing.

**AJOURN:** Being no further business to discuss, the meeting adjourned at 10:55 a.m.

Bart Howard, Chairman